**Ada Betty CUADROS–FERNANDEZ,**
**Appellant,**

v.

**The STATE of Texas, Appellee.**

**No. 05–06–01464–CR.**

Court of Appeals of Texas,
Dallas.

Aug. 28, 2009.

Pamela J. Lakatos, Plano, for Appellant.

John R. Roach, Sr., Collin County Dist. Atty., Jeffrey S. Garon, Asst. Crim. Dist. Atty., McKinney, for State.

Before Justices MORRIS, FITZGERALD, and LANG.

## OPINION

Opinion By Justice FITZGERALD.

Ada Betty Cuadros–Fernandez appeals her conviction for capital murder of a child under six years of age. After the jury found appellant guilty, the trial court sentenced appellant to the mandatory sentence of life imprisonment. TEX. PENAL CODE ANN. §§ 12.31(a), 19.03(b) (Vernon Supp. 2008). Appellant brings five points of error contending the evidence is legally and factually insufficient to support her conviction, the trial court erred in admitting certain evidence, and the trial court erred in excluding the opinion testimony of appellant's expert witness. We reverse the trial court's judgment and remand the cause for further proceedings.

## BACKGROUND

Rene and Mike Lazarchik were the parents of twin boys, Ryan and Kyle, born in August 2004. After the birth of the twins, the Lazarchiks decided to hire a live-in nanny to care for their children in the home when Rene returned to work. After interviewing several nanny candidates, the Lazarchiks hired appellant, who had recently moved to the United States from Peru, to be the nanny. Appellant started work in November 2004. Appellant stayed in the Lazarchiks' house during the week and stayed with her aunt and uncle on the weekends. For nearly a year, there were no problems, and the Lazarchiks were satisfied with appellant's performance.

In the summer of 2005, appellant told Rene that her aunt and uncle were moving back to Peru and then to Germany and that she would be moving with them. Appellant purchased a plane ticket for October 29, 2005. Appellant agreed to assist the Lazarchiks in selecting a new nanny.

On Wednesday October 12, 2005, the Lazarchiks were supposed to interview candidates for nanny, and Rene telephoned appellant to make macaroni and cheese for the children. Appellant prepared the meal for the children and fed them. When

Rene got home, the twins appeared normal. After interviewing the nanny candidates, Rene held Kyle for about an hour and did not observe any marks, redness, or swelling on Kyle.

The next morning, Thursday October 13, Kyle awoke crying at 5 a.m. This was unusual as the twins usually slept until someone tried to awaken them. Rene went to the twins' bedroom, picked up Kyle, and rocked him until he went back to sleep. Rene did not notice any marks, redness, or swelling on Kyle. Rene was not feeling well, and she went back to bed. Mike got the twins up at about 7:30 a.m. and, leaving the twins in appellant's care, went to work. Rene left her bedroom at about 9:20 a.m., changed Ryan's diaper, picked up Kyle and kissed him, and then left for work. When Rene left, Kyle was "fine and happy and smiling" and had no cuts, bruises, redness, or anything else that caught her attention.

At about 12:50 p.m., while the twins were in appellant's sole care, Kyle showed symptoms of serious medical problems, and appellant called 911. Appellant explained to the 911 operator that the child had stopped breathing and was turning purple. The operator explained to appellant how to clear the child's mouth and told appellant to perform CPR and "mouth-to-mouth." The paramedics arrived and took Kyle to the local hospital. One of the firemen dispatched to the scene testified appellant was distraught. The fireman asked appellant what had happened, and she explained to him that she set the child in his crib after feeding him lunch, and when she returned with the other child, he started vomiting and stopped breathing. Appellant then called Rene, and the fireman told Rene the child was being taken to the McKinney hospital.

Rene testified appellant called her at about 1:00 p.m. and said, "Hurry, hurry, Kyle's not breathing. I've already called 911." Rene called 911 to make sure the dispatcher had the correct address and knew the patient was a child. She then left the office. While Rene was on the way to the house, she called appellant. Appellant explained that after feeding the twins lunch, she took Kyle out of his chair and set him on the floor of the playroom as normal. She went to get Ryan, and noticed Kyle had vomited. Appellant said she went to get a plate to catch the vomit, and she saw Kyle had fallen over. Appellant picked up Kyle, took him to the sink, and tried to do what Rene had shown her in case of choking, but it did not work. Appellant told Rene she then tried CPR.

When Rene got to the house, the ambulance had already left with Kyle, but police officers were still there. Rene picked up appellant and Ryan, and they followed the police to the hospital. Mike met them at the hospital. The McKinney hospital transported Kyle by helicopter to Dallas Children's Hospital. Mike, Rene, appellant, and Ryan went back to the house, and Mike and Rene got ready to go to Dallas Children's Hospital. Appellant asked Rene to let her know what was happening with Kyle. Mike and Rene left appellant in charge of Ryan. On the way to the hospital, Rene became concerned that appellant might be too upset to care for Ryan properly, and Rene called a friend, Janet Wood, and asked her to go to the house and help appellant.

At Dallas Children's Hospital, Rene learned that Kyle had suffered extensive head injuries and was not expected to live. When the doctors suggested that appellant might have hurt Kyle, Rene was shocked at the idea. At first, Rene thought appellant must have fallen with Kyle or dropped him and been too upset to tell her. However, when the doctors told her the extent of Kyle's injuries and the level of force

necessary to cause them, Rene no longer thought the injuries could have been accidental. Rene called another friend and asked her to go to the house and get Ryan.

Janet Wood testified she went to the Lazarchiks' house as Rene requested, and appellant opened the door for her. Appellant was upset and crying, and Wood asked her what had happened. According to Wood, appellant said Kyle was standing between the playroom and the kitchen and he collapsed.[1] Appellant set down the plate she was carrying, picked up Kyle, carried him into the living room and performed CPR on him. Appellant told her "Kyle's brain had not fully developed and this was something that started from when he was born." Appellant's demeanor varied from being calm to upset. Appellant told Wood she loved Kyle and would never hurt him. Wood tried to calm and reassure appellant by telling her she had not done anything wrong and that she was a good person. After about an hour, Wood left to check on her own family, and then she returned to the Lazarchiks' house. While Wood was away, appellant called her several times on her cell phone asking if Wood knew what was going on. When Wood returned to the house, appellant was quiet and not crying. However, when a police car drove by the house, appellant became hysterical and began wailing. Appellant fell down behind the door inside the house and said she would never hurt Kyle.

The police car that drove past was headed for the Lazarchiks' house, but McKinney Police Detectives Kathy Hudson and Ida Wei were having difficulty finding the house. The officers knew that a child had been seriously injured and had stopped breathing and had been transported from McKinney to Dallas Children's Hospital. Hudson testified that she and Wei wanted to talk to appellant because appellant had placed the 911 call and had been the only person present when the child stopped breathing. Hudson stated that when she and Wei found the house and got out of the car, they heard screaming coming from inside the house. When they entered the house, Hudson saw appellant screaming and Wood trying to comfort her. Hudson asked Wood to help appellant calm down, and Hudson explained that she and Wei were there to talk to appellant to learn what had happened. When appellant had calmed down, Hudson asked her to explain what had happened concerning Kyle.[2]

Hudson testified that appellant said she had finished feeding the twins their lunch, and she carried Kyle from his highchair in the kitchen to the playroom. She set him on the playroom floor and was burping him when he began vomiting. Appellant said she ran to the kitchen to get a bowl to catch the vomit because Rene does not like stains on the floor. Appellant had caught some of the vomit in the bowl when Kyle suddenly turned blue, fell over, and went into convulsions. Appellant carried him to the living room, called 911, and followed the operator's instructions.

While Hudson interviewed appellant, Wei called the hospital to learn the nature and extent of Kyle's injuries, and Wei passed the information to Hudson. Hudson told appellant her story did not explain how Kyle had injured his head. Appellant said Kyle might have hit his head when he fell over after she set him on the floor of

---

1. According to Rene, Kyle could not yet stand up or walk on his own.

2. After initially talking to appellant, the detectives used an audio recorder to record their interrogation of appellant. The recording and a written transcription were admitted into evidence, and the recording was played for the jury.

the playroom. The playroom floor was covered in soft mats, and Hudson told appellant that Kyle could not have hit his head sufficiently hard by falling over backwards on the mats. Appellant then said she might have bumped Kyle's head on the doorjamb while carrying him on her hip, and she said Rene and Mike "bump his head all the time and nothing ever happens to him." Hudson asked appellant to demonstrate how Kyle's head struck the doorjamb, and appellant showed how she was walking with Kyle on her hip and his head struck the doorjamb. When the detectives explained that it was not sufficient force to cause the injuries and that the doctors had told them Kyle's injuries were much more severe, appellant explained she was running when Kyle's head struck the doorjamb. Hudson examined the doorjamb, but she saw no indication that Kyle's head had struck it. Appellant denied shaking or hitting Kyle, and she told the detectives there was no one else in the house aside from Ryan when Kyle collapsed. The detectives told appellant her knowledge of how Kyle was injured could save his life and urged her to tell them what happened. Appellant offered no other explanation of how Kyle was injured. The detectives obtained an arrest warrant for appellant and arrested her for injury to a child.

Dr. Matthew Cox examined Kyle at Dallas Children's Hospital. Dr. Cox testified Kyle externally had multiple bruises on the right side of his head, some bruising on the left side of his head and left shoulder, and bruising on both arms. Kyle also had two little punctate hemorrhages or bruises on his right temple. The three main areas of bruising to Kyle's head showed there were three different impacts to his head. Internally, Kyle had bleeding within his brain (a subdural hematoma), bleeding in the retinas (retinal hemorrhaging) and retinal folding, and markedly swollen brain tissue (severe cerebral edema). Normal pressure inside the head of a child Kyle's age is 20 millimeters of mercury; Kyle's pressure measured 90 millimeters. The retinal hemorrhaging and retinal folding indicated severe trauma. Kyle did not have any broken bones. The pattern of the injuries, without a clear explanation of the severe traumatic event, indicated an inflicted head injury or an abusive head injury. Dr. Cox stated, "This is a severe traumatic event. It would have been an obvious act of trauma that would have caused this." He also testified that the injuries were consistent with severe blunt force trauma, including someone swinging Kyle in a manner causing his head to contact a hard object such as a kitchen cabinet door. Dr. Cox testified that Kyle's bruises were "fresh" but he could not tell how old they were beyond being "fairly recent." He testified that a bruise could be "12, 16 hours" old and still be a "fresh" bruise.

On Friday morning, October 14, tests showed Kyle was brain dead, and the Lazarchiks agreed to his removal from life support. The child died after the removal of the life-support equipment.

Dr. Sheila Spotswood, a Dallas County Medical Examiner, testified the autopsy showed multiple small overlapping bruises on Kyle's scalp as well as the pair of punctate abrasions on Kyle's right temple. There were also four or five other pairs of punctate injuries on Kyle's head similar to the punctate abrasions on his right temple. The multiple bruises and abrasions indicated several impact sites on Kyle's head. Kyle had a large area of hemorrhage in one of the layers between the brain and the skull. His brain was swollen and had areas of herniation where it was swollen and forced into spaces that it was not normal for the brain to go. There was also hemorrhage visible around the optic

nerve and in the retinas of both eyes; Dr. Spotswood testified, "It takes a lot of force to cause that." Kyle's cause of death was ruled to be blunt force head injuries. Dr. Spotswood testified Kyle's injuries were severe and were consistent with his head being struck against a wooden kitchen cabinet door several times. She also testified that Kyle's injuries were not consistent with Kyle's hitting his head against a door-jamb or falling off a kitchen counter. She stated those impacts might be sufficient to cause some bruising, but they would not be sufficient to cause the retinal hemorrhaging, the multiple overlapping bruises, or the multiple paired punctate injuries.

Forensic detectives searched the Lazarchiks' house for evidence. After completing their investigation, they asked Wood and other family and friends of the Lazarchiks to clean up from their investigation so the house would be presentable when the Lazarchiks returned. On Friday, October 14, Wood and others were cleaning the house when Wood spotted a piece of tape sticking out from a cabinet door beneath the counter of the kitchen island. Wood opened the door and saw it was broken and held together with masking tape. Wood testified that the door "had fallen apart from the tape and so I just put my foot up there and kind of scooted it back together. . . ." Wood stated that Rene was "pretty particular so the children don't get hurt. So I knew that with anything being sharp or sticking out that would just be so out of the ordinary for them, in their home." Rene testified that the cabinet door was one she frequently opened and that she had not seen tape on that door before.

The police returned to the house and retrieved the cabinet door, and they deliv-ered it to the Southwest Institute for Forensic Sciences (SWIFS) for further testing. The autopsy report on Kyle observed "punctate abrasions" on Kyle's right temple one-half inch apart from each other. An analyst at SWIFS measured the distance between metal fasteners that protruded from the cabinet door and determined they were the same distance apart as the punctate abrasions found in the autopsy. The analyst told the lead detective on the case of this observation.

A SWIFS analyst also swabbed the cabinet door and the masking tape found on the door for traces of DNA. According to the report of the DNA analysis, SWIFS compared the DNA found on the door and the tape to DNA taken from appellant, Kyle, Rene, and Mike.[3] The swab from the masking tape found on the cabinet door showed DNA from a major and a minor contributor. The DNA profile from the major contributor matched appellant's DNA profile, and the minor contributor was an unidentified source. The possibility of another person having the same DNA profile found on the tape as appellant's ranged from 1 in 185 billion for Hispanics to 1 in 502 trillion for African Americans. The swab from the crack along the inside indentation of the cabinet door disclosed DNA of low quantity and poor quality consisting of one genetic marker corresponding to appellant, Kyle, and Mike. The swab from along the outside of the crack revealed DNA that was also of low quantity and poor quality consisting of five genetic markers corresponding to the genetic markers in Rene's genetic profile.

On October 17, 2005, McKinney Police Detectives Jim Adams and Marco Robles

---

**3.** State's Exhibit 8 does not indicate any comparisons were made to the DNA of the twins' older sister (who was staying with a different babysitter on October 13) or Ryan. Dr. Spotswood testified that identical twins have identical DNA.

interviewed appellant at the jail.[4] Robles questioned appellant in Spanish and acted as translator between appellant and Adams. During this interview, appellant explained about the events on October 13, including that Kyle's head struck the door-jamb. She also stated that on October 12, while she was making the macaroni and cheese, she had Kyle sitting on a kitchen counter when he fell off the counter and landed hard on the tile floor. Appellant said she checked him to make sure he had not broken any bones. The right side of his head and his right ear were red, and she put a cold pack on the right side of his face and gave him Tylenol. She said she did not tell Rene about this accident because when Rene came home that evening, she had a headache and wanted the lights off and everything quiet. Appellant did not know Kyle had died, and when Adams told her, appellant immediately began weeping, and she cried throughout the rest of the interview. The officers asked her if she had fallen with Kyle, and she said she did not. She also stated there was no one else in the house when Kyle collapsed. Adams testified that he never asked her about the cabinet door during the interview.

## SUFFICIENCY OF THE EVIDENCE

■ In her first and second points of error, appellant contends the evidence is legally and factually insufficient to support the jury's verdict. We apply well-known standards when reviewing challenges to the legal sufficiency of the evidence. *See Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979); *Lane v. State*, 151 S.W.3d 188, 191–92 (Tex.Crim. App.2004). In determining the legal sufficiency of the evidence, we view all of the evidence in the light most favorable to the verdict to determine whether any rational

trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Jackson*, 443 U.S. at 319, 99 S.Ct. 2781; *Vodochodsky v. State*, 158 S.W.3d 502, 509 (Tex.Crim.App.2005). In making this determination, the reviewing court considers all the evidence admitted including improperly admitted evidence. *Conner v. State*, 67 S.W.3d 192, 197 (Tex.Crim. App.2001); *Holberg v. State*, 38 S.W.3d 137, 139 (Tex.Crim.App.2000).

In evaluating the factual sufficiency of the evidence, we view all the evidence in a neutral light and ask whether the evidence demonstrates the proof of guilt is so weak or the conflicting evidence is so strong as to render the verdict clearly wrong and manifestly unjust. *Roberts v. State*, 220 S.W.3d 521, 524 (Tex.Crim.App.), *cert. denied*, 552 U.S. 920, 128 S.Ct. 282, 169 L.Ed.2d 206 (2007); *Watson v. State*, 204 S.W.3d 404, 414–15 (Tex.Crim.App.2006). We set aside a verdict only when, based on some objective basis in the record, we are able to say the great weight and preponderance of the evidence contradicts the verdict. *Watson*, 204 S.W.3d at 417. We are permitted to substitute our judgment for the factfinder's when considering credibility and weight determinations, but only to a "very limited degree." *Marshall v. State*, 210 S.W.3d 618, 625 (Tex.Crim.App. 2006). We must give almost complete deference to the factfinder's decision when that decision is based upon an evaluation of credibility. *Lancon v. State*, 253 S.W.3d 699, 705 (Tex.Crim.App.2008).

■ The trial court instructed the jurors that to convict appellant, they had to find beyond a reasonable doubt that appellant knowingly caused Kyle's death by inflicting blunt force trauma on Kyle by striking his head against a cabinet door and that Kyle was under six years of age.

---

4. The interview was videotaped, and the tape was played for the jury.

It was undisputed that Kyle was under six years of age when he died. The medical evidence showed he died as a result of the infliction of blunt force trauma consisting of multiple blows to the head. Appellant stated she was alone with the twins for at least two hours before Kyle collapsed. When an adult defendant has sole access to a child at the time the child sustains the injuries, the evidence is sufficient to support a conviction for injury to a child, or murder if the child dies. *Garcia v. State*, 16 S.W.3d 401, 405 (Tex.App.-El Paso 2000, pet. ref'd).

A physician who examined Kyle and the medical examiner testified that Kyle's injuries were consistent with his head being struck against a cabinet door. The evidence showed Kyle had punctate injuries the same distance apart as the metal fasteners on the cabinet door. The evidence also showed the cabinet door had been recently broken and then repaired using masking tape containing appellant's DNA.

Appellant raises other complaints as to the sufficiency of the evidence, including the age of bruises, the manner in which her interrogation was conducted, and Kyle's developmental history and condition. But it is the role of the jury, and not this Court, to judge the credibility of the witnesses, and we must give almost complete deference to the jury's determination of the weight to be given the testimony. *Lancon*, 253 S.W.3d at 705, 707.

After reviewing all the evidence in the light most favorable to the verdict, we conclude that a rational juror could find beyond a reasonable doubt that appellant knowingly caused Kyle's death by inflicting blunt force trauma on him by striking his head against a cabinet door and that Kyle was a child younger than six years of age. After reviewing all the evidence in a neutral light, we conclude the proof of appellant's guilt is not so weak, nor is the contrary evidence so strong, as to render the jury's verdict of guilty clearly wrong and manifestly unjust. Accordingly, the evidence is legally and factually sufficient to support appellant's conviction. We overrule appellant's first and second points of error.

## ADMISSIBILITY OF EVIDENCE CONCERNING THE CABINET DOOR

In her third and fourth points of error, appellant contends the trial court erred in admitting State's Exhibit 8, the expert report and notes concerning analysis of the cabinet door for DNA. In her fifth point of error, appellant contends the trial court erred in excluding the testimony of her expert witness concerning the cause of the damage to the cabinet door.

### The DNA Report

The report and most of the notes attached to the report were prepared by Kerri Kwist, a DNA analyst with SWIFS. Kwist did not testify at trial. Instead, the State introduced its exhibit 8 through the testimony of Andra Krick, a trace-evidence analyst at SWIFS. Krick testified that she was present when the DNA samples were collected. Krick also testified that she was a custodian of records for SWIFS, the documents in exhibit 8 were business records of SWIFS kept in the regular course of business of SWIFS, the entries on those records were prepared in the regular course of business by an employee of SWIFS with personal knowledge of the events or acts recorded, and the records were made at or near the time of the event recorded. Krick was not a DNA analyst, she did not perform any of the DNA testing, and she could not testify to whether the DNA testing was performed properly.

Exhibit 8 included Kwist's report describing the evidence tested, the results of

the testing, Kwist's conclusions (which appear to be summaries of the results), the statistical analysis of the results comparing the DNA profiles found in the testing to the general population, the disposition of the evidence, the additional comment that an unknown DNA profile found on the swab of the tape would be entered in the Combined DNA Index System, and a table of the DNA profiles of the evidence tested. The exhibit also contains many pages of graphs apparently concerning the testing, some containing handwritten notations, and all initialed "KK"; hand-written charts apparently concerning the testing; forms setting out the chain of custody of the evidence; forms listing the evidence submitted and the analysis requested;[5] memoranda of telephone calls between Krick and Detective Adams[6] and between Kwist and Krick concerning what evidence the State wanted tested;[7] and a memorandum from Detective Adams to "Examiner" briefly describing the case to explain why the State wanted the cabinet door and the tape tested for DNA.[8]

5.  On the form dated October 28, 2005 requesting analysis of the cabinet door and the three rolls of masking tape found in the house, Detective Adams requested the following:

    Fingerprint the masking tape attached to the inside of door. Compare the ends of the tape to the three rolls of tape found at the crime scene. The small roll of tape was in kitchen drawer and was nearest the door. Door had been cleaned but had not come apart during the cleaning. Check (new exposed) wood for hair & body fluids (for DNA comparison to victim).

6.  A memorandum dated November 1, 2005 by Krick of a telephone call with Detective Adams states,

    Spoke with Detective Adams in regards to the submittal of a cabinet door which had been cracked/broken & taped w/ masking tape to conceal the crack/broken door. Regarding the fingerprinting of the tape: not to be done. Doesn't carry as much weight as locating DNA/hairs off the exposed/cracked surface. The accused (nanny) had lived in the house for a year. Detective Adams would just like us to look at the door for DNA/hairs from the newly exposed/cracked surface. Also, to pick up possible DNA from the masking tape.

    A memorandum dated November 17, 2005 by Krick of a telephone call with Detective Adams states,

    Spoke with Detective Adams regarding the analysis of the cabinet door. I informed Detective Adams that there did not visually appear to be anything significant regarding the crack in the door/molding. No hairs/fibers or staining appeared to be associated with the newly exposed wood surface in the crack. I did mention to Detective Adams the observation of 3 tiny finish nails that were exposed on the edge of the crack & that they were just barely "poking" out from the flush surface of inside surface of the door. I informed Detective Adams that 2 out of the 3 nails were approximately .5cm apart, which corresponds to the ME's report on 2 punctate abrasions on the victim[']s face that were circular in diameter and .5cm apart. Based on that information at this time, the swabs collected from the exposed new wood surface & including the surfaces around the nails are to be analyzed.

7.  A memorandum dated November 21, 2005 by Kwist of a conversation with Krick states,

    Andra came to speak with me about this case. She said that she had talked to the Det. and explained that we were not sure if we would find any usable DNA from the cabinet door. He said we did not have to worry about the swab from the tape, but to please go ahead with the DNA from the crack. Compare to comp.

8.  The October 28, 2005 memorandum states,

    On 10/13/2005, the victim Kyle Lazarchik was taken to the local hospital by ambulance for a perceived choking/seiz[ure] problem. He was taken by care flight to Children[']s Medical Center Dallas for a severe head injury. Once there he was diagnosed as a blunt force trauma to the head victim. He died on 10/15/2005 due to these injuries. The autopsy was performed at the M.E. Office. The examiner ruled the

Appellant objected that the report was hearsay and not subject to the exception for records of regularly conducted activity, and she objected that the admission of the report without the opportunity to cross-examine Kwist violated her right to confront the witnesses against her. The trial court overruled the objections and admitted the exhibit.

The trial court's decision to admit or exclude evidence is reviewed for abuse of discretion. *Walters v. State*, 247 S.W.3d 204, 214 (Tex.Crim.App.2007). The trial court abuses its discretion only when the decision lies "outside the zone of reasonable disagreement." *Id.* (quoting *Apolinar v. State*, 155 S.W.3d 184, 186 (Tex. Crim.App.2005)).

### Confrontation

■ In her fourth point of error, appellant contends the trial court erred in admitting State's Exhibit 8 over appellant's objection that the State's failure to present Kwist for cross-examination about the exhibit violated appellant's Sixth Amendment right to confront the witnesses against her. After appellant objected to the exhibit on confrontation grounds, the State had the burden of establishing the evidence was admissible. *De La Paz v. State*, 273 S.W.3d 671, 680–81 (Tex.Crim.App.2008);

*Vinson v. State*, 252 S.W.3d 336, 340 (Tex. Crim.App.2008).

The Confrontation Clause of the Sixth Amendment guarantees that "[i]n all criminal prosecutions, the accused shall enjoy the right ... to be confronted with the witnesses against him." U.S. CONST. amend. VI. In *Crawford v. Washington*, 541 U.S. 36, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004), the Supreme Court held that out-of-court testimonial evidence violates the Confrontation Clause unless the declarant is unavailable to testify and the defendant had a prior opportunity to cross-examine him. *Id.* at 68, 124 S.Ct. 1354. In this case, the State did not show appellant had a prior opportunity to cross-examine Kwist; thus, the question is whether State's Exhibit 8 is testimonial in nature.

■ "Generally speaking, a hearsay statement is 'testimonial' when the surrounding circumstances objectively indicate that the primary purpose of the interview or interrogation is to establish or prove past events potentially relevant to later criminal prosecution." *De La Paz*, 273 S.W.3d at 680. Whether a statement is testimonial is a question of law. *Id.*

The Supreme Court has held that admission of laboratory results in a similar situation violated the defendant's right to

death a homicide due to blunt force trauma to the head.

The suspect had remained at the home for several hours after the victim had been transported and cleaned the house. Over the next two days other people also cleaned the area. The broken cabinet door was not discovered until it was opened by a relative and it fell apart in her hands. The victim['s] parents reported that the cabinet had not been broken before the incident. They called the police and it was recovered along with the masking tape.

I suspect the suspect/nanny had pushed the door back together and then taped it to conceal the damage. I also suspect that the victim had made contact with the door the

day of the incident with enough force to split the wood and damage it.

Please fingerprint the masking tape on the door for comparison with the suspect['] s prints. Also please check the newly exposed wood for trace evidence such as body fluids and hair fibers for DNA comparison to the victim. His DNA should be available from the M.E. office. Also please compare the ends of the tape with the [three] rolls of tape we found at the house. I suspect the smaller roll was the one used because it was the only one found in the kitchen area and is about the same size.

Thank you,

Det. Jim Adams, McKinney Police [D]epartment

confront the laboratory technicians. In *Melendez–Diaz v. Massachusetts*, —— U.S. ——, 129 S.Ct. 2527, 174 L.Ed.2d 314 (2009),[9] the defendant was tried for distributing and trafficking in cocaine. *Id.* at 2530. To prove the substance at issue was cocaine, the prosecution presented certificates of analysis, which were affidavits from analysts at the state laboratory stating, "The substance was found to contain: Cocaine." *Id.* at 2531. The defendant objected, asserting that the Confrontation Clause required the analysts to testify in person. *Id.* Citing its earlier opinion in *Crawford*, the Supreme Court stated that the Confrontation Clause "guarantees a defendant's right to confront those 'who "bear testimony"' against him." *Id.* (quoting *Crawford*, 541 U.S. at 51, 124 S.Ct. 1354). The Court stated that one of the "core class of testimonial statements" was "extrajudicial statements ... contained in formalized testimonial materials, such as affidavits ...; statements that would lead an objective witness reasonably to believe that the statement would be available for use at a later trial." *Id.* (quoting *Crawford*, 541 U.S. at 51–52, 124 S.Ct. 1354). The Court held "the analysts' affidavits were testimonial statements, and the analysts were 'witnesses' for purposes of the Sixth Amendment" and that the defendant had a right to confront the analysts at trial. *Id.* at 2532.

The issue, then, is whether the DNA report in this case, although not in the form of an affidavit, is testimonial. The Supreme Court did not end its analysis with its observation that the certificates were affidavits; it also looked to the substance of the certificates to determine if they were "made under circumstances which would lead an objective witness rea-sonably to believe that the statement would be available for use at a later trial" and to the use of the affidavits to determine if they were "functionally identical to live, in-court testimony, doing 'precisely what a witness does on direct examination.'" *Id.* (quoting *Crawford*, 541 U.S. at 52, 124 S.Ct. 1354; *Davis v. Washington*, 547 U.S. 813, 830, 126 S.Ct. 2266, 165 L.Ed.2d 224 (2006)).

In determining that the certificates were "made under circumstances which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial," the Supreme Court assumed that the analysts were aware of the certificates' purpose because that purpose was printed on the certificates. *Id.* In this case, Kerri Kwist's knowledge that the DNA report she prepared "would be available for use at a later trial" is apparent from her notes included in State's Exhibit 8. Those notes state that the DNA testing was requested by "McKinney PD," and Kwist reported her findings to Detective Adams who said he would report them to the district attorney. Other documents in State's Exhibit 8 initialed by Kwist show the investigation concerned a homicide: the victim was a fourteen-month-old male who died of severe blunt force trauma to the head, appellant was the suspect, and she was the victim's nanny. In addition, the memorandum written by Detective Adams states: "I suspect the suspect/nanny had pushed the door back together and then taped it to conceal the damage. I also suspect that the victim had made contact with the door the day of the incident with enough force to split the wood and damage it." Given the evidence of Kwist's knowledge of the case from these documents and that the

9. We note that *Melendez–Diaz* was a case of first impression and was decided by the Su-preme Court after appellant's conviction.

district attorney was actively involved in the case, we can conclude only that Kwist believed her DNA report concerning the masking tape on the door would be available for use at a later trial.

Turning to the second factor, whether State's Exhibit 8 was "functionally identical to live, in-court testimony, doing 'precisely what a witness does on direct examination,'" the record is clear that the State used Exhibit 8 in exactly this fashion. The report itself was the only evidence presented of the DNA results and was presented as a substitute for in-person testimony concerning the DNA testing.

The State argues that laboratory reports are not subject to the Confrontation Clause because they simply document procedures and the results of those procedures. The Supreme Court rejected that argument in *Melendez–Diaz* and observed that confrontation of the analyst is necessary to permit defendants to expose analysts who may be incompetent or even dishonest. *Id.* at 2536–37. Moreover, "the prospect of confrontation will deter fraudulent analysis in the first place." *Id.* at 2537.

The State has failed to meet its burden to show the admission of State's Exhibit 8 did not violate appellant's Sixth Amendment right of confrontation. We conclude the trial court abused its discretion in overruling appellant's Confrontation–Clause objection and in admitting State's Exhibit 8.[10]

### Exclusion of the Cabinet Maker's Expert Testimony

In her fifth point of error, appellant contends the trial court abused its discretion in excluding David Gardner's expert testimony "to rebut the state's theory." Because this issue is likely to arise again in the event of a retrial and the parties have thoroughly briefed it, we address it in the interest of judicial economy and in the interest of justice. *See Sparks v. State*, 68 S.W.3d 6, 12 (Tex.App.-Dallas 2001, pet. ref'd) (addressing charge-error complaint in the interest of judicial economy after sustaining *Batson* complaint), *abrogated in part on other grounds by Guzman v. State*, 85 S.W.3d 242 (Tex.Crim.App.2002); *see also Ramirez v. State*, 815 S.W.2d 636, 640 (Tex.Crim.App.1991); *Nu–Way Energy Corp. v. Delp*, 205 S.W.3d 667, 684 (Tex. App.-Waco 2006, pet. denied) ("Even though we will remand for reconsideration of the attorney's fee award, we also address the remaining issues because they are likely to arise on remand."), *cert. denied*, 552 U.S. 1039, 128 S.Ct. 652, 169 L.Ed.2d 509 (2007); *Petty v. Petty*, 592 S.W.2d 423, 426–27 (Tex.Civ.App.-Dallas 1979, no writ) (reversing judgment and addressing additional issue raised by parties because issue was likely to arise again on remand).

■ If the trial court's evidentiary ruling is correct on any theory of law applicable to that ruling, it will not be disturbed even if the court stated an incorrect reason for its correct ruling. *De La Paz v. State*, 279 S.W.3d 336, 344 (Tex.Crim.App.2009); *State v. Herndon*, 215 S.W.3d 901, 905 n. 4 (Tex.Crim.App.2007).

■ Concerning the admissibility of expert testimony, rule of evidence 702 provides: "If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness quali-

---

**10.** Because we have concluded the trial court abused its discretion in admitting State's Exhibit 8 over appellant's Confrontation–Clause objection, we need not address appellant's third point of error asserting the trial court erred in overruling appellant's hearsay objection to that exhibit.

fied as an expert by knowledge, skill, experience, training, or education may testify thereto in the form of an opinion or otherwise." TEX.R. EVID. 702. The proponent of scientific evidence must show, by clear and convincing proof, that the evidence is sufficiently relevant and reliable to assist the jury in accurately understanding other evidence or in determining a fact in issue. *Gallo v. State,* 239 S.W.3d 757, 765 (Tex. Crim.App.2007), *cert. denied,* —— U.S. ——, 128 S.Ct. 2872, 171 L.Ed.2d 813 (2008).

The trial court held a hearing outside the presence of the jury to determine the admissibility of Gardner's opinions. Gardner testified he was the production manager at Texas Woodsmith, the company that built and installed the Lazarchiks' cabinets. Although he had worked for Texas Woodsmith for only two years, Gardner's entire career has been in cabinet making. The State agreed Gardner was an expert on the manufacturing of cabinets. As production manager, Gardner was responsible for determining the cause of failures of the product, including cracks and separations in cabinet doors. One of Gardner's duties was to determine the cause of damage to cabinets that are returned. This investigation was often necessary to determine whether the cost of replacement cabinetry must be borne by the homeowner, the homebuilder, or the manufacturer. Gardner also tested new cabinet doors, observing how different forces on different woods and on different places cause damage.

Gardner examined the photographs in evidence of the Lazarchiks' cabinet door as well as the door itself. He testified the door was not damaged in the manner that a door would be damaged from something hitting against the back side of it with great force. Gardner stated for that kind of force, "I would expect to see damage all the way down[—]not just at the top[—]and

damage on the opposite side." Gardner stated the damage shown by the door had two likely causes. A "very common" cause of that kind of damage was a hairline crack created by the insertion of the metal fasteners in the door and the crack growing over time. The damage could also have been caused by someone leaning on the door while open, using the door as leverage to stand up, or standing on the door, and a hairline crack would make the door more susceptible to this damage.

Appellant offered Gardner as an expert on the cause of damage to cabinet doors. The State objected that Gardner was not qualified to testify about the manner in which the cabinet door broke or the mechanism that caused it to break. The trial court ruled that Gardner could not testify as an expert because he "cannot meet the Daubert standard." *See Daubert v. Merrell Dow Pharm., Inc.,* 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993). The trial court permitted Gardner to testify as a fact witness, and in that capacity he testified about the construction of the cabinet door. He testified that the metal fasteners "appear to have created a hairline crack" in the cabinet door, which weakened the joint.

■ The State agreed that Gardner was an expert on the manufacture of cabinet doors. The State did not agree that Gardner was an expert in determining the cause of damage to cabinet doors. Accordingly, we must determine whether appellant established Gardner's qualifications to testify as an expert on that subject. To determine whether an expert witness is qualified, the trial court considers whether the witness has a sufficient background in a particular field and "whether that background 'goes to the very matter on which [the witness] is to give an opinion.'" *Vela v. State,* 209 S.W.3d 128, 131 (Tex.Crim. App.2006) (quoting *Broders v. Heise,* 924

S.W.2d 148, 153 (Tex.1996)). As the court of criminal appeals explained, "The focus, then, is on the 'fit' between the subject matter at issue and the expert's familiarity therewith, and not on a comparison of the expert's title or specialty with that of the defendant or a competing expert." *Id.* at 133 (quoting *Broders,* 924 S.W.2d at 153).

In this case, Gardner testified that as a regular part of his job, he investigates the cause of damage to Texas Woodsmith's cabinets, including the same model cabinet doors as the door at issue with damage similar to that of the cabinet door in this case. The record shows Gardner had sufficient familiarity with the subject of determining the cause of damage to cabinet doors to qualify as an expert on the subject. Thus, there is a "fit" between the issue of the cause of the damage to the cabinet door and Gardner's familiarity with that subject.

▮ Next, we consider whether Gardner's testimony would assist the jury in understanding the evidence or a fact in issue. The indictment alleged, and the charge required the jury to find beyond a reasonable doubt, that the cabinet door was the instrument used to inflict the fatal blunt force trauma on Kyle. The State's theory of the case was that appellant struck Kyle repeatedly against the back of the cabinet door breaking the door and that she attempted to cover up her crime by taping the door together. The State's evidence of this theory consisted of the following facts: (1) the door was found to be broken and taped back together, and the Lazarchiks had not previously observed the broken door, (2) appellant's DNA was on the masking tape used to repair the door, (3) the doctors who examined Kyle before and after he died testified his injuries were consistent with his head repeatedly striking a cabinet door, and (4) the punctate abrasions on Kyle's head

were the same distance apart as the metal fasteners protruding from the back of the door. These facts are circumstantial evidence of the use of the door to inflict the injuries. Gardner's testimony (1) that the damage to the door was inconsistent with having been broken by something hitting against the back of it, and (2) that the damage was consistent with two other non-criminal scenarios would have assisted the jury in making its determination of whether the door was the instrument used to inflict the blunt force trauma on Kyle.

▮ Finally, we turn to the reliability of the evidence. When scientific evidence is presented, the proponent of the evidence must show that (1) the underlying scientific theory is valid, (2) the technique applying the theory is valid, and (3) the technique was properly applied on the occasion in question. *Roberts,* 220 S.W.3d at 530 (citing *Kelly v. State,* 824 S.W.2d 568, 573 (Tex.Crim.App.1992)). However, when, as here, the expert's testimony is based on his experience and skill and not scientific methods and procedures, courts consider the following three questions: (1) whether the field of expertise is a legitimate one, (2) whether the subject matter of the expert's testimony is within the scope of that field, and (3) whether the expert's testimony properly relies upon and/or utilizes the principles involved in the field. *Gallo,* 239 S.W.3d at 765 (citing *Nenno v. State,* 970 S.W.2d 549, 561 (Tex. Crim.App.1998), *overruled on other grounds by State v. Terrazas,* 4 S.W.3d 720, 727 (Tex.Crim.App.1999)).

▮ Applying these factors, Gardner's testimony established that the field of determining the cause of damage to cabinetry is a legitimate one because that determination is necessary to apportion liability for the cost of repair or replacement of damaged cabinetry. Gardner's proffered testimony about the cause of the damage

to the door was within the scope of that field. Gardner's opinion of the cause of the damage to the cabinet door relied upon and utilized the principles involved in the field. Gardner testified about his years of experience building and installing cabinets, testing cabinets' ability to withstand stresses, and his knowledge of the damage caused to cabinets by different types of stress or abuse.

The State asserts on appeal that the trial court's exclusion of Gardner's opinion testimony was not an abuse of discretion because "the manner in which the door was broken does not conclusively resolve the ultimate issue of fact because the issue was not what caused the crack in the door, only whether Appellant had smashed Kyle's head into it." The State's position on appeal is disingenuous in light of its stated position at trial that the impact with the child's head caused the door to break and that the fact the door was broken proved it was the murder weapon. In its opening statement, the State asserted that the "Defendant took that baby and slammed his head up against a cabinet door in the kitchen and slammed his head against that cabinet door so hard, in fact, that it cracked the cabinet door." In the jury argument as well, the prosecutor stated, "Defendant, who was supposed to protect and who was supposed to care for Kyle, took him and beat his head repeatedly over and over and over in the cabinet door, and she did that with enough force that that door broke"; "[a]nd we not only know what Kyle's injuries were, but we know exactly how they were caused because we have this broken door, State's Exhibit No. 23, that was not broken before this happened to Kyle." Similarly, the prosecutor later stated, "We are talking about someone who took that child and beat his head on the cabinet over and over again"; and "You have severe head trauma, a broken cabinet...."

Gardner's testimony that the damage caused by something hitting against the back of the cabinet door would be significantly different from the damage exhibited by the cabinet door in this case is evidence directly relevant to the fact issue of "whether Appellant smashed Kyle's head into it."

█ The State argues the trial court did not abuse its discretion because Gardner stated he could not testify he was "100 percent sure" that the door was not broken through something hitting up against it. However, even in the scientific realm, "100 percent" certainty is not necessary for an expert opinion to be admissible. *See Daubert*, 509 U.S. at 590, 113 S.Ct. 2786 ("Of course, it would be unreasonable to conclude that the subject of scientific testimony must be 'known' to a certainty; arguably, there are no certainties in science.").

The State also argues Gardner's testimony about the existence of a hairline crack in the door was unreliable because he testified he could not see a hairline crack in the photographs of the door. The record, however, reflects that Gardner testified the existing large crack may have started as a hairline crack caused by the insertion of the metal fasteners during the construction of the door and that the crack followed the grain of the wood until the wood gave way resulting in the observed damage to the door, or the hairline crack weakened the wood such that less force was required to create the resulting damage than would otherwise be required.

The State also asserts that Gardner testified in the offer of proof that the door could have been broken as the State alleged. The record, however, reflects that Gardner testified as follows:

Q. Okay, let me ask you this. Could this door, is it reasonable to believe

that this door would have been broken by something hitting up against the back side of it as the State alleges?

A. It very well could have been.

Q. Well, let me ask you this. If something hit up against the back of the door, what damage would you expect to see?

A. I would expect to see damage all the way down[—]not just at the top[—]and damage on the opposite side.

Q. And the opposite side, are you saying on the opposite side, the front part of the door?

A. The face; yes, ma'am.

According to the record, Gardner testified that the damage would have been far more extensive than that depicted had the door been damaged in the manner that the State presented. Gardner's answer to the first question was that if something struck against the back of the door as the State alleged, the door "very well could have" broken. Gardner's answer to the next question was that if the door had actually been used in the manner asserted by the State, the damage would have been different and more extensive. His answer was not that something hitting against the back of the door would have resulted in the door's being broken in the manner that it was. The record thus shows Gardner's proffered testimony contradicted the State's theory of the case and the State's medical evidence that the injuries were consistent with the child's head being struck against the back of a wooden cabinet door.

Appellant sufficiently established the reliability of Gardner's testimony. We conclude the trial court abused its discretion by excluding Gardner's testimony of his opinion of the cause of the damage to the cabinet door and whether the damage was caused by its being used to inflict blunt force trauma.

## Harm Analysis

■■■ Having found the trial court erred in two rulings, we must determine whether the errors require the reversal of appellant's conviction. "If the appellate record in a criminal case reveals constitutional error that is subject to harmless error review, the court of appeals must reverse a judgment of conviction or punishment unless the court determines beyond a reasonable doubt that the error did not contribute to the conviction or punishment." Tex. R.App. P. 44.2(a). "Any other error, defect, irregularity, or variance that does not affect substantial rights must be disregarded." Tex.R.App. P. 44.2(b). The Texas Court of Criminal Appeals has explained that "[i]f there is a reasonable likelihood that the error materially affected the jury's deliberations, then the error was not harmless beyond a reasonable doubt." *Wesbrook v. State*, 29 S.W.3d 103, 119 (Tex.Crim.App.2000). Stated as a question, the reviewing court asks whether "there was a reasonable possibility that the error, either alone or in context, moved the jury from a state of nonpersuasion to one of persuasion as to the issue in question." *Id.* The fact that the properly admitted evidence is sufficient to support the verdict does not demonstrate that the error was harmless. *Brooks v. State*, 132 S.W.3d 702, 708 (Tex.App.-Dallas 2004, pet. denied).

## Confrontation Clause Harm Analysis

■■■ Courts reviewing whether an error in admitting out-of-court statements in violation of the Confrontation Clause is harmless beyond a reasonable doubt should consider several factors:

(1) The importance of the hearsay statements to the State's case;

(2) Whether the hearsay evidence was cumulative of other evidence;

(3) The presence or absence of evidence corroborating or contradicting the hearsay testimony on material points; and

(4) The overall strength of the prosecution's case.

*Davis v. State*, 203 S.W.3d 845, 852 (Tex. Crim.App.2006).

■■■ We first address the importance of the DNA evidence. The trial court instructed the jury that to convict appellant, the jury had to find beyond a reasonable doubt that appellant caused Kyle's death by inflicting blunt force trauma on him by striking his head against a cabinet door; if the jury did not so find, then the jury was to acquit.

The State's evidence showed Kyle's parents cared for him Wednesday evening and Thursday morning until about 9:30 a.m. Appellant alone cared for Kyle from about 9:30 a.m. until appellant made the 911 call at 1:00 p.m. Kyle was thereafter immediately transported to the hospital. The medical experts testified severe head trauma was the cause of death. Dr. Cox did not pinpoint the time of Kyle's injuries but opined generally that his bruises were "fresh," meaning they could have been up to twelve to sixteen hours old.

Under these circumstances, the evidence of the damage to the cabinet door, the medical testimony that Kyle's injuries were consistent with having his head struck against a cabinet door, and the DNA report showing appellant's DNA on the tape used to repair the inside (back) of the cabinet door, were significant components of the State's evidence. Kyle's mother testified that she first saw the tape on the cabinet door when she returned to the house after Kyle died. She also testified that the cabinet door was one that was used very frequently. Appellant's DNA furnished the physical connection between the cabinet damage and appellant. Without the DNA report, the State's evidence showed a broken cabinet door, that Kyle's injuries were consistent with being struck against a cabinet door, and that the distance between the metal fasteners on the back of the cabinet door was the same as the distance between the punctate abrasions on Kyle's head. The DNA report showing appellant's DNA on the tape used to repair the cabinet door actually linked appellant to the repair of the broken cabinet door.

We conclude the DNA report constituted significant evidence. Further, this evidence was not cumulative or corroborated.

In its jury argument, the State relied on the DNA report to show appellant broke the door in the act of violence and tried to repair the door with the masking tape to conceal her guilt. After explaining about the metal fasteners and the punctate abrasions, the prosecutor argued:

What else do we know about that cabinet? Well, we know that someone tried to hide the damage that was done to that cabinet. Someone tried to conceal what had happened in that kitchen.

Well, who would do that? This Defendant would. And we know that because you have in evidence as State's Exhibit No. 8 a report from SWIFS regarding the DNA on the tape.

And on Page 3 it tells us that with regard to that tape on the inside of the door the probability of selecting at random, going out and selecting someone at random who is not related to this Defendant who would have the same DNA profile as on that tape for the Hispanic population is one in 185 billion.

The probability of walking out of this courtroom and finding someone else whose DNA is that other than hers is one in 185 billion.

Ladies and gentlemen, she put that tape on that door to conceal what she had done to Kyle.

\* \* \*

Does an innocent person attempt to conceal her actions after the fact? Because that's exactly what this Defendant did when she placed that masking tape on this cabinet door while she's alone while Mike and Rene are at Children's Medical Hospital wondering whether their child is going to live or die.

This woman is alone in there with no one watching her. And we know from that DNA report, and I ask you to go back there and look at that report prepared by SWIFS, because you're going to find that her DNA was on that masking tape that came out of that house. She put that tape on, ladies and gentlemen, because she is not an innocent person.

As for the overall strength of the State's case, the State's proof linking appellant to the offense was based on circumstantial evidence. Kyle's injuries required the application of great force. Appellant was the only adult present with Kyle and Ryan. Appellant gave the officers several explanations as to how Kyle could have sustained head injuries, but she always denied shaking or hitting him. The State argued the DNA report physically linked appellant and the alleged murder weapon and showed behavior by appellant inconsistent with her innocence. As the State's jury argument shows, the State emphasized that the DNA report proved appellant brutally murdered Kyle, that she used the cabinet door to do so, and that she attempted to cover up the incriminating evidence. Under the State's presentation of the case, the evidence of appellant's DNA on the tape repairing the cabinet door constituted substantial evidence that she

was personally involved in the repair of the alleged murder weapon.

After considering the entire record, we cannot determine beyond a reasonable doubt that the erroneous admission of State's Exhibit 8 did not contribute to appellant's conviction. We sustain appellant's fourth point of error.

### Exclusion of Expert Testimony Harm Analysis

We also conclude that the trial court's error in excluding Gardner's expert testimony was not harmless error. The erroneous exclusion of evidence rises to the level of constitutional error when the excluded evidence "forms such a vital portion of the case that exclusion effectively precludes the defendant from presenting a defense." *Potier v. State*, 68 S.W.3d 657, 665 (Tex.Crim.App.2002); *see Walters v. State*, 247 S.W.3d 204, 221 (Tex.Crim.App. 2007) (citing *Potier*); *Ray v. State*, 178 S.W.3d 833, 835 (same). In that situation, we must reverse unless we determine beyond a reasonable doubt that the error did not contribute to the conviction or to the punishment assessed. Tex.R.App. P. 44.2(a); *Stephenson v. State*, 226 S.W.3d 622, 628 (Tex.App.-Amarillo 2007, no pet.).

By excluding Gardner's testimony that the damage to the door was not caused by hitting something hard against the back of the door but was instead caused either by someone leaning or standing on the door or by a hairline crack created during the construction of the door and expanding over time, the court prevented appellant from presenting the evidence to directly counter the State's position that the broken cabinet door and its subsequent repair were evidence of her guilt. Furthermore, Gardner was the primary witness and the only expert presented by the defense who had knowledge regarding the specific type of cabinet at issue. Thus, Gardner's ex-

pert testimony formed such a vital part of appellant's case that the trial court's exclusion of that evidence effectively prevented appellant from presenting a defense. Finally, we cannot overlook the fact that during its rebuttal closing argument, the State specifically drew attention to appellant's failure to call any expert witnesses in her defense.[11] By drawing attention to the defense's failure to call any expert witnesses, the State increased the harmful effect of the trial court's erroneous ruling. We conclude the trial court's error in excluding the evidence amounts to constitutional error. *See Potier,* 68 S.W.3d at 665; *Stephenson,* 226 S.W.3d at 628–29; *Tiede v. State,* 104 S.W.3d 552, 564 (Tex.App.-Tyler 2000, pet. ref'd). After reviewing the record, this Court cannot say beyond a reasonable doubt that exclusion of vital expert testimony intended to directly counter the State's theory did not contribute to the conviction in this case. *See* Tex.R.App. P. 44.2(a); *Stephenson,* 226 S.W.3d at 628 (erroneous exclusion of expert testimony on reliability of eyewitness testimony was harmful constitutional error); *Tiede,* 104 S.W.3d at 564 (exclusion at punishment phase of testimony of neuropsychologist's testimony concerning issues of sudden passion, adequate cause, and defendant's dissociative behavior was harmful constitutional error); *cf. Lighteard v. State,* 982 S.W.2d 532, 535 (Tex.App.-San Antonio 1998) (erroneous refusal to appoint psychiatrist to assist defense when defendant's sole defense was insanity was harmful con-

stitutional error), *pet. ref'd,* 994 S.W.2d 189 (Tex.Crim.App.1999). We conclude the error was harmful. We sustain appellant's fifth point of error.

## CONCLUSION

We conclude that the trial court erred by admitting the DNA report in violation of appellant's constitutional rights under the Confrontation Clause. We also conclude that the trial court erred by excluding relevant and admissible defense expert testimony that would have tended to rebut the State's theory of the case. Because we cannot say beyond a reasonable doubt that these errors were harmless, we are constrained to reverse the trial court's judgment and remand the cause for further proceedings.

---

11. The State argued as follows:

Now, I think it's telling when we talk about Dr. Cox and Dr. Spotswood. Not a single medical person [was] called to that stand by the Defense, not one single expert.

\*　　\*　　\*

Not one single expert got on that stand either treating physician or hired expert to tell you that they had any problems, even a small problem with the conclusions drawn

by those two experts, and that's very, very telling.

Because that means again if you are to decide this case on the evidence before you in this courtroom, there is no expert testimony to contradict two highly qualified people who told you this child suffered severe head trauma because of multiple blows to his head that were consistent with that head coming in contact with that cabinet door.