**AFFIRMED; Opinion Filed April 21, 2014.**



In The

# Court of Appeals
# Fifth District of Texas at Dallas

### No. 05-13-00408-CR

**JOSHUA SEAN MUEGGE, Appellant**
**V.**
**THE STATE OF TEXAS, Appellee**

**On Appeal from the 380th Judicial District Court**
**Collin County, Texas**
**Trial Court Cause No. 380-82053-2012**

## MEMORANDUM OPINION
Before Justices Moseley, Francis, and Lang
Opinion by Justice Lang

Following a plea of not guilty, appellant Joshua Sean Muegge waived a jury trial and was convicted by the trial court of injury to a child. TEX. PENAL CODE ANN. § 22.04(a)(3), (f) (West 2013). Punishment was assessed at ten years' confinement. In his sole issue on appeal, appellant contends the evidence is insufficient to sustain his conviction.

For the reasons stated below, we affirm the trial court's judgment.

### I. FACTUAL AND PROCEDURAL BACKGROUND

The testimony at trial shows that in October 2011, appellant lived in a home with fifteen-month-old B.M.K. and B.M.K.'s mother ("Mother"). Mother and appellant had been in a relationship since August 2011 and began living together in September 2011.

Mother testified that, after appellant moved in, there were "rocky moments" in their relationship, including fights and arguments. She further testified that, when she first began

dating appellant, appellant got along well with B.M.K. However, around early October 2011, she noticed a change in appellant's relationship with B.M.K., particularly that B.M.K. would cry whenever appellant "came around." Mother testified that she asked appellant "just to leave [B.M.K.] alone" and that she would care for B.M.K. herself.

Mother testified B.M.K. was a healthy child and that, prior to appellant moving into her home, she had never witnessed any bruising or physical injury on B.M.K.'s body. However, Mother's father and stepmother both testified that, in late October, they had begun to notice bruising on B.M.K.'s ears and cheek.

On the morning of Saturday, October 29, 2011, Mother, her father, and her stepmother went to clean out a storage unit. B.M.K. accompanied them, and Mother, her father, and her stepmother all testified that B.M.K. appeared normal at that time.

Appellant was at the home he shared with Mother when she, her father, and her stepmother returned to the home around 10:30 AM. Mother testified she, her father, and her stepmother were all playing with B.M.K. after they returned home that morning, but that appellant did not. Between 11:30 AM and noon, Mother's father and stepmother returned to the storage unit, and Mother placed B.M.K. in a playroom to watch TV. She testified B.M.K. appeared normal and was not crying at this time.

Mother then went outside to the garage to organize items she had removed from storage. She heard B.M.K. crying about a half hour later. She immediately went inside, where she saw appellant holding B.M.K. She testified that she took B.M.K. away from appellant and asked why he was holding B.M.K. since appellant "agreed he would have nothing to do with [B.M.K.'s] care." Appellant responded that he had intended to put B.M.K. down for an afternoon nap, an act appellant had never done before. Mother put B.M.K. down for a nap herself and returned to the garage.

–2–

Mother attempted to wake B.M.K. from the nap around 2:30 PM. At that time, she observed B.M.K. was "very groggy," and after she placed B.M.K. in a recliner chair, B.M.K.'s head kept dropping, as if trying to fall asleep. She testified these behaviors were "very unusual" for B.M.K.

Appellant offered to give B.M.K. a bath to help wake B.M.K. up, although appellant had never given the child a bath before. Nevertheless, Mother allowed appellant to do so. Less than ten minutes later, appellant brought B.M.K. to Mother and pointed out a bruise on B.M.K.'s hairline. Mother testified the bruise was "pretty large" and "fairly fresh."

Mother attempted to lay the child on its back to change clothes. She testified B.M.K. "kept lifting [its] head up" as though in pain, a behavior she described as "very unusual." She saw B.M.K.'s head was "very tender and red" and observed another bruise on B.M.K.'s forehead. Mother's friend arrived shortly thereafter, and Mother, her friend, and B.M.K. immediately left for the emergency room. Mother asked appellant if he would come to the emergency room with her, but she could "tell by his action (sic) that he did not want to come."

While at the hospital, Mother received a text message from appellant, stating in part, "I just want you to know I would never hurt your baby . . . ." Mother testified, when she received this text message, she had not yet accused appellant of injuring B.M.K. and agreed with the prosecutor at trial that this statement was something appellant "brought up on his own."

The pediatrician who treated B.M.K. at the hospital on October 29 and 30 testified that, upon B.M.K.'s admission, she observed bruising, hematomas, and swelling on the child. B.M.K. was found to have multiple skull fractures to the occipital bone, a bone located in the back of the head. The pediatrician testified, "In general, the occipital bone is very difficult to break and requires high force." She testified further that the occipital bone is "[t]ruly one of the hardest bones to break" because of its location in the back of the head and that one does not tend to see

accidental breaking of this bone. She testified it would only be possible for a child to break this bone from a "very significant fall", like from a roof or a second story, and that the child would have to land on the lower back part of his or her head to incur this injury. After observing B.M.K.'s scans, which featured three breaks, the pediatrician concluded B.M.K.'s injuries were "more likely" caused by more than one strike.

The pediatrician stated the "most reasonable" explanation would be that B.M.K.'s injuries occurred on October 29 because B.M.K. had a history of appearing normal and playful the morning before being taken to the hospital and because symptoms would be expected to manifest shortly after this kind of injury. She testified that she would expect to see a child with B.M.K.'s injuries to be crying, possibly vomiting, and avoiding pressure on the affected area. She indicated that someone using a force sufficient to inflict these injuries would have known he was injuring the child.

At trial, appellant presented the testimony of a forensic pathologist, who testified B.M.K. could have sustained those injuries from simply falling on a small object. The pathologist testified it would not be impossible for a child to act normally for several days after the injury without exhibiting symptoms, but did admit on cross-examination that it "doesn't make sense" for a child to have sustained this injury on a Tuesday, when B.M.K. would have been in its father's care, and not exhibit any signs of pain, hematomas, or grogginess until the following Saturday. The pathologist further testified, "[i]n this particular case where you have a punched-in fracture," a rapid and forceful action would be necessary to create such an injury.

Mother testified she had not observed the child fall or hit its head on October 29 or on the days preceding the accident, and she had never seen the kinds of bruises like the ones that developed that day. B.M.K.'s father also testified at trial, stating that when B.M.K. was in his

care two days earlier, B.M.K. appeared normal and that Mother had never indicated to him that B.M.K. was acting "funny" in the days prior to October 29.

Following B.M.K.'s admission to the emergency room, appellant was interviewed by an Allen Police Department detective about B.M.K.'s injuries. Appellant confirmed he and Mother were the only people caring for B.M.K. at the time the injury occurred and was able to provide a detailed time line about what happened in the days leading to B.M.K.'s injury. However, the detective testified that appellant's time line "became a little fuzzy" around 12:30 PM on October 29, just before B.M.K. was put down for a nap. Appellant told the detective that Mother did not cause B.M.K.'s injuries. Although appellant did not admit to causing the injuries himself, the detective testified that, when the detective told appellant he must have caused B.M.K.'s injuries given the time line, appellant "kind of just went blank," but did not deny the accusation. The detective described this behavior as "a bit unusual."

## II. SUFFICIENCY OF THE EVIDENCE

### A. Standard of Review

When a defendant argues the evidence is legally insufficient to support his conviction, the reviewing court must consider all the evidence in the light most favorable to the verdict and "determine whether, based on that evidence and reasonable inferences therefrom, a rational fact finder could have found the essential elements of the crime beyond a reasonable doubt." *Gear v. State*, 340 S.W.3d 743, 746 (Tex. Crim. App. 2011) (citing *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)). A reviewing court cannot "re-evaluate the weight and credibility of the record evidence" and "substitute [its] judgment for that of the fact-finder." *Williams v. State*, 235 S.W.3d 742, 750 (Tex. Crim. App. 2007) (quoting *Dewberry v. State*, 4 S.W.3d 735, 740 (Tex. Crim. App. 1999)).

***B. Applicable Law and Application of the Law to the Facts***

A person commits injury to a child if he intentionally or knowingly acts to cause bodily injury to a child. TEX. PENAL CODE ANN. § 22.04(a)(3) (West 2013).

In his sole issue, appellant argues the evidence was legally insufficient to support his conviction for injury to a child. We construe appellant's briefing to raise two arguments.

*1. Sufficiency of Evidence to Sustain Conviction*

First, appellant argues the evidence was insufficient to sustain the trial court's conviction because the State's "evidence alone [was] exceedingly weak." He points to the State's abandonment of two of the four counts for which appellant was initially charged in the indictment as proof of the "inherent weakness of the state's flimsy evidence," and argues that "mere presences (sic) is insufficient to sustain a guilty verdict."

However, "[w]hen an adult defendant has sole access to a child at the time the child sustains the injuries, the evidence is sufficient to support a conviction for injury to a child." *Cuadros-Fernandez v. State*, 316 S.W.3d 645, 654 (Tex. App.—Dallas 2009, no pet.) (citing *Garcia v. State*, 16 S.W.3d 401, 405 (Tex. App.—El Paso 2000, pet. ref'd)); *see also Lewis v. State*, No. 05-12-00844-CR, 2014 WL 31690, at *6 (Tex. App.—Dallas Jan. 6, 2014, no pet.) (not designated for publication). The testimony at trial shows B.M.K. was injured on October 29, the date of admission into the hospital. This is because B.M.K. would have shown signs of pain and lethargy within a few hours of the injury, but the child was playful and cheerful earlier that morning.

The testimony also shows that appellant behaved unusually on October 29. He offered, for the first time, to put B.M.K. down for a nap and give the child a bath. Further, he spontaneously sent a text message to Mother stating, he would "never hurt [her] baby . . ." During the investigation, appellant confirmed he and Mother were the only ones with access to

B.M.K. around the time B.M.K. was injured, and appellant expressly denied that Mother hurt B.M.K.

Finally, the testimony at trial showed that these injuries were such that the one who inflicted these blows would have known he was injuring the child. Moreover, "[i]ntent can be inferred from the extent of the injuries to the victim, the method used to produce the injuries, and the relative size and strength of the parties." *Herrera v. State*, 367 S.W.3d 762, 771-72 (Tex. App.—Houston [14th Dist.] 2012, no pet.) (using the severity of the injuries sustained by an infant victim as evidence of adult defendant's intent).

Appellant's briefing suggests the evidence could support different conclusions, noting that "several individuals had contact with the child" on October 29 and that, as a fifteen-month-old toddler, B.M.K. had a tendency to fall and strike its head. However, in our review, we must give deference to the "the responsibility of the trier of fact to fairly resolve conflicts in testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts." *See Williams*, 235 S.W.3d at 750. Giving proper deference to the court's verdict, this argument cannot be sustained.

*2. Sufficiency of Evidence to Prove "Manner and Means Unknown to the Grand Jury"*

Second, appellant contends the evidence was insufficient to sustain his conviction "because the State failed to prove 'Manner and Means Unknown to the Grand Jury.'" Appellant argues, because the language in Count I of the indictment stated appellant "intentionally and knowingly cause[d] serious injury to [B.M.K.] . . . by manner and means unknown to the Grand Jury," the State was required to prove that "the grand jury, after exercising due diligence, did not know the manner and means of inflicting the injury, and that it did exercise due diligence in an attempt to ascertain the manner and means."

However, "sufficiency of the evidence should be measured by the elements of the offense as defined by the hypothetically correct jury charge for the case." *Malik v. State*, 953 S.W.2d 234, 240 (Tex. Crim. App. 1997) (en banc). In the case of injury to a child, a "non-essential element allegation, *such as an allegation that the object used to cause the serious bodily injury was unknown to the grand jury*, may properly be excluded" from a hypothetically correct charge. *Richards v. State*, 54 S.W.3d 348, 350 (Tex. App.—Houston [1st Dist.] 2001, pet. ref'd) (emphasis added); *see also Gollihar v. State*, 46 S.W.3d 243, 256 (Tex. Crim. App. 2001) (holding that "a hypothetically correct charge need not incorporate allegations that give rise to immaterial variances"). Consequently, "such an allegation is disregarded in a sufficiency of the evidence review." *Richards*, 54 S.W.3d at 350. Moreover, assuming the evidence was insufficient to show that the manner and means were unknown to the grand jury after due diligence, "such would be an immaterial variance." *See id.* (noting that the State did not need to prove the grand jury used "due diligence" in its attempt to ascertain the weapon used in the case).

We decide against appellant on his sole issue.

### III. CONCLUSION

The trial court's judgment is affirmed.

/Douglas S. Lang/
DOUGLAS S. LANG
JUSTICE

Do Not Publish
TEX. R. APP. P. 47.2(b)

130408F.U05

–8–



# Court of Appeals
# Fifth District of Texas at Dallas

## JUDGMENT

JOSHUA SEAN MUEGGE, Appellant

No. 05-13-00408-CR     V.

THE STATE OF TEXAS, Appellee

On Appeal from the 380th Judicial District Court, Collin County, Texas
Trial Court Cause No. 380-82053-2012.
Opinion delivered by Justice Lang.   Justices Moseley and Francis participating.

Based on the Court's opinion of this date, the judgment of the trial court is **AFFIRMED**.

Judgment entered this 21st day of April, 2014.

 /Douglas S. Lang/
DOUGLAS S. LANG
JUSTICE