COURT OF APPEALS
EIGHTH DISTRICT OF TEXAS
EL PASO, TEXAS



| | | |
|---|---|---|
| TERRENCE HARPER, | § | No. 08-23-00106-CR |
| Appellant, | § | Appeal from the |
| .<br>v. | § | 186th Judicial District Court |
| THE STATE OF TEXAS, | § | of Bexar County, Texas |
| Appellee. | § | (TC# 2018-CR-13416) |

## <u>MEMORANDUM OPINION</u>

Appellant Terrence Harper appeals his conviction of intentionally or knowingly causing serious bodily injury to his son, T.H.[1] Appellant does not dispute that he seriously injured T.H. What is disputed is whether he did so intentionally or knowingly or whether it was an accident. The State's medical expert witnesses supported the case that T.H.'s injuries resulted from intentional or knowing conduct. Appellant was prepared to present an expert witness to show that Appellant's version of events—an accident—could medically explain T.H.'s injuries. Because we hold that the trial court abused its discretion in refusing to allow Appellant's expert witness to testify, we reverse and remand for a new trial.

---

[1] This case was transferred pursuant to the Texas Supreme Court's docket equalization efforts. Tex. Gov't Code Ann. § 73.001. We follow the precedent of the Fourth Court of Appeals to the extent they might conflict with our own. *See* Tex. R. App. P. 41.3.

## I. FACTUAL AND PROCEDURAL BACKGROUND

Three dynamics help to understand the record and issues in this appeal. Appellant was charged with causing serious bodily injury to his son, T.H. Yet much of the trial time was devoted to evidence of the death of a child named Ethan six years earlier when Ethan was in Appellant's care. At the time of that event, Appellant was not charged with any crime, but as this case unfolded, the State indicted him for capital murder in that earlier event and presented evidence about it in this trial.[2] A second dynamic was that Appellant's trial counsel unsuccessfully moved to continue the trial setting, based in part on his having just finished a four-week capital murder trial. The trial judge for the 186th District Court overruled the continuance because the judge was about to end his term as the judge of that court in the next few months. This brings us to the third dynamic. During this three-week trial, three different judges presided over the trial (one for voir dire, one for the State's case, and still a different judge for Appellant's case-in-chief and closing argument). A fourth judge heard the motion for new trial.

Appellant does not assert that the evidence is insufficient to support the conviction, but does challenge several trial court rulings that require us to assess whether any error is reversible. Accordingly, we set out the trial evidence with some detail, focusing first on the evidence for T.H.'s injuries, then the death of Ethan. Appellant testified in his own defense, so we set out his version of events alongside what the State claims its evidence proved.[3]

---

[2] That case remained pending as of the date of this appeal.

[3] Appellant's initial counsel withdrew after being elected as the Bexar County District Attorney. That office recused itself and pro tem counsel handled the case both at trial and on appeal.

### A. T.H. suffers serious, disabling injuries

Appellant and his fiancé, Taylor H., took four-month-old T.H. to his pediatrician, Dr. David Ross, on the morning of July 12, 2018. T.H. was in an apparent seizure and showed two small bruises and scratches to the chest, multiple bruises to the back, and two scratches to the neck. Dr. Ross immediately called 911 and requested an ambulance to transport T.H. to University Hospital. At the hospital, T.H. was diagnosed with a subdural hematoma and retinal hemorrhaging. As a result of these injuries, T.H. has permanent and severe disabilities. Two-thirds of his brain is dead from the lack of blood flow caused by swelling. It is unlikely that T.H. will ever be able to talk or walk, he is blind, cannot eat regular foods, and will have seizures for the rest of his life.

Appellant and Taylor H. are T.H.'s biological parents. Appellant, who was watching T.H. the night before, first denied to health care providers that T.H. suffered any trauma, except that their pet dog jumped on him. Soon after, however, he claimed that while holding T.H. in one arm, T.H. bucked backward and hit his head on a kitchen counter. The evidence and witnesses at trial told two stories—one described by the State's indictment that Appellant intentionally and knowingly injured T.H. by shaking him and/or striking him against an unknown object. The other story was Appellant's version of events describing an accident. We summarize the key testimony and evidence below.

#### (1) Taylor H.'s testimony

Taylor met Appellant in 2016 and they soon became engaged; Taylor then became pregnant with T.H. Appellant attended all of Taylor's prenatal checks, and later attended all the well-baby checks. Shortly after T.H.'s birth, there was a concern that T.H. had a bleeding disorder because he continued to bleed for two days after his finger was pricked for lab work. By the time T.H. was about three months old, however, the issue had resolved itself. Both Taylor and Appellant took

3

FMLA leave after T.H.'s birth, but then both returned to work: Taylor worked day shifts and Appellant evening shifts. They parented together on weekends. On weekdays, Taylor watched T.H. during the evening, and Appellant during the daytime.

In July 2018, Taylor needed to go out of town for work; the plan was to take T.H. to Appellant's parents' house so they could assist in the childcare. Taylor bathed T.H. before leaving and noticed no bruising or contusions on his body. She left on a Tuesday and communicated with Appellant through text messages on Wednesday. That night, she learned Appellant had not taken T.H. to his grandparents' house. Between 8:01 and 9:39 p.m., Appellant was not responding to Taylor's texts. At 9:39 p.m. he responded, texting that "We're fine, just taking the care of baby." But at 9:50 p.m. he phoned Taylor and told her that T.H. was fussy and not feeling well and "seemed like he was sick." The two texted for the next 30 minutes over what might be causing T.H. to feel sick, ending with Appellant's promise: "Yo, if anything changes, trust me, I'll be at the ER before anything." At some point, Taylor told Appellant to put the Owlet—a "smart sock" that measures vitals—on T.H. and she was able to monitor his vitals through an app on her phone. She did not know if Appellant kept the device on T.H. all night.

The next morning Taylor texted Appellant at 5:31 a.m. asking how T.H. was doing. An hour later, Appellant responded that T.H. had thrown up twice during the night but was presently sleeping. The two began a series of texts starting around 7:00 a.m. that led Taylor to start looking for an urgent care that might see T.H. Around 8:00 a.m., Appellant sent Taylor photos of T.H. that alarmed her. Appellant also sent videos, but through Snapchat (a program that automatically deletes material after a short time). Taylor recalled that T.H. "didn't look normal," looked "lifeless almost" and "swollen" in the videos. Appellant texted Taylor that T.H. also had bruises and he

4

questioned whether something happened when T.H. was at their friend's house the weekend before. Appellant agreed to take T.H. to his pediatrician, Dr. Ross, and Taylor would meet them there.

When Taylor arrived at the doctor's office, Appellant was already there filling out paperwork. T.H. was still in his car seat and he was "blank faced," moaning, and shaking. Taylor took him out of the car seat and alerted staff about his condition. They were brought back to Dr. Ross who noted that T.H.'s heart rate was low, and he needed oxygen. Dr. Ross administered oxygen while his staff called 911.

T.H. was transported to the hospital by ambulance. Taylor described Appellant's demeanor until this point as calm, but once they were at the hospital, Appellant was crying and trying to console Taylor. When T.H.'s onesie was removed, Taylor saw that he had bruises. The doctors informed them that T.H. had a skull fracture, a brain bleed, had suffered a stroke, and had healing rib fractures. In the medical histories taken, Appellant gave multiple explanations for the injuries. He said that the dog jumped on T.H. in bed or that T.H. could have hurt himself in the bathtub.

The following day, Appellant told Taylor that he needed to tell her what really happened. He said that he was holding T.H. as he was making his bottle and T.H. flung himself backward and hit his head on the counter. Taylor told Appellant that his explanation made sense and asked him why he had not told the doctors. Appellant told her that he would call CPS and tell them what happened. While Taylor testified that she did not believe that it was an accident, she also testified that at the time she believed Appellant "was the perfect dad," and that she never saw him lose his temper or shake T.H. Taylor recounted one time when T.H. had a bruise on his eye that Appellant explained was from T.H. hitting his head on a toy. In retrospect, she questioned Appellant's explanation.

## (2) Brandi Flores's CPS interview

The State called Brandi Flores, a CPS investigator, who testified about and played her audio taped interview with Appellant. The day after T.H. was injured, Appellant called Flores and arranged for a voluntary interview. He told her that he was holding T.H. while making a bottle for him when T.H. flung himself backward and hit his head on the marble countertop. T.H.'s eyes rolled back, and Appellant thought he had died. He tried to perform CPR and slapped T.H. on the back until he came to. Appellant told Flores that he knew he should have called 911 but was not thinking straight. After some time, T.H. seemed fine and they went to sleep, but the dog jumped in the bed during the night, causing the scratch on T.H.'s neck. Appellant first noticed signs of a seizure (T.H.'s leg was twitching) at 7:30 a.m. He believed the bruises were from his effort to revive T.H. and he said that he did not know what could have caused fractured ribs.

## (3) The medical evidence

Many of the State's witnesses were medical professionals who testified about T.H.'s injuries and the inferences about intent that can be drawn from those injuries. As we explain below, Appellant had one medical expert witness who was not allowed to testify.

## (a) Dr. David Ross

Dr. Ross started seeing T.H. as his regular pediatrician 18 days post-birth. On the initial evaluation, T.H. was healthy; Appellant and Taylor never reported any out of the ordinary concerns. Dr. Ross examined T.H. for his two-week visit and observed a mark on T.H.'s trunk that Appellant and Taylor said was caused by the dog hitting the child with a bone it was playing with. Although it was later discovered that T.H. had fractured ribs, Dr. Ross testified that during the

previous visits, there was no sign of an injury or that T.H. was experiencing pain or discomfort that might warrant ordering x-rays.

When Appellant brought T.H. to his office on July 12, 2018, Appellant reported that T.H. had had a large stool, vomited twice, and the dog jumped on him, causing him to cry for 45 minutes. He told Dr. Ross that T.H. was acting "unusual" with his head and eyes tracking to the right and his leg twitching. When Dr. Ross saw T.H., he was immediately concerned because T.H. appeared to be having a seizure; he was not tracking movements or responding to voices. He also noticed that T.H. had scratches and bruises on his forehead, chest, back, and neck. Dr. Ross called an ambulance and T.H. was transported to the hospital.

### (b) Eduardo Casas

Eduardo Casas, a paramedic, transported T.H. from Dr. Ross's clinic to the hospital. He testified that he saw bruises and scratches on T.H. and that T.H. had a deviated right-side gaze. Appellant also told him that his dog had jumped on T.H. in bed. Both Appellant and Taylor appeared concerned, but Casas made a CPS report because Appellant's explanation was not consistent with the injuries. On cross-examination, he agreed that bruising could be caused by CPR, even if it is done correctly.

### (c) Dr. Daniel Gebhard

Dr. Daniel Gebhard was the ICU pediatrician who treated T.H. at University Hospital. He had a specific recollection of this case as it was one of those cases that he was "keenly aware of." Because the injury pattern was suspicious, he personally took the patient history from Appellant and Taylor. Appellant told Dr. Gebhard that T.H. was doing well until about 8:30 p.m. the night before when he had a large bowel movement and vomited. He gave T.H. a bath and left him in the baby bath seat unattended for about 25 minutes, checking on him every couple of minutes. He saw

T.H. hit his head on the seat. After the bath, T.H. was still fussy but went to sleep. At about 2:00 a.m., the dog jumped on the bed and scratched T.H.'s neck and T.H. cried for 20 minutes and went back to sleep. Appellant also reported that in the morning, he saw the bruises on T.H. He gave the infant a bottle, but T.H. did not finish it. Around 7:30 a.m., he noticed T.H.'s foot twitching and they decided to take him to the doctor.

Dr. Gebhard diagnosed T.H. with an acute subdural hematoma. That kind of injury usually occurs from a shearing or rotational type injury mechanism where the infant's head moves forward then backward. The injury causes bleeding, that compresses the brain, and here, swelling that cut off blood flow to two-thirds of T.H.s brain (killing those portions of the brain). T.H. also had retinal hemorrhages and masculoschisis, or ripping of the retina. Dr. Gebhard testified that hemorrhages like T.H.'s are caused either by high-speed impacts or shaking and that they are found in 85% of babies that are shaken. He explained that these injuries happen in infants "because babies' necks are weak and so they really can't stop themselves. They can't control their necks and their head flings a lot harder and so there's a lot more rotational energy that rips the retina off." However, even with these injuries, T.H. could have had normal vital signs through the night.

Dr. Gebhard noticed bruising on T.H.'s back, chest, forehead, and the nape of the neck. Some of the bruises looked like fingernail marks or finger indentations and could have been from holding T.H. too tightly or from improper CPR procedures, although he had not been told that CPR had been performed. He also found that T.H. had rib fractures older than 14 days and testified that such fractures result from significant force. Like Dr. Ross, he stated that rib fractures are not apparent visually and may have only resulted in increased fussiness for a short time.

Dr. Gebhard's opined that T.H.'s injuries were "consistent with a child that's been severely beaten over the course of his short life. Most recently, his injuries seem most consistent with a

child who was squeezed tightly around the chest and slammed into an object causing a traumatic brain injury." However, Dr. Ross allowed that hitting his head on the counter could have caused at least some of T.H.'s injuries. But "[i]t probably still isn't consistent with the degree of the injuries and the multiple broken ribs on both sides of the kid's body."

### (d) Dr. Bradley Norat

Dr. Norat is a child abuse pediatrics fellow at Center for Miracles who evaluates children suspected of being abused. When T.H. was in the P.I.C.U., Dr. Gebhard called him for a consultation.

Dr. Norat spoke with Appellant and Taylor to get a patient history and Appellant again said that T.H. had a big bowel movement, was fussy, and that the dog had jumped on the bed in the middle of the night. He did not tell Dr. Norat that T.H. hit his head on the counter. Taylor told Dr. Norat that T.H. had in the past rolled off the bed onto his back, but Dr. Norat thought that unlikely to have fractured T.H.'s ribs.

Dr. Norat also confirmed Dr. Gebhard's diagnosis of a subdural hematoma, brain swelling, and retinal damage, and, like Dr. Gebhard, he explained the injuries to the jury. On direct examination, he testified that T.H. most likely suffered a shearing injury from inertial force, that lead to swelling in the brain and then an anoxic injury. On cross examination, he agreed that a subdural hematoma and retinal injuries could result from either an impact or rotational injury but added that this injury was more likely from an inertial injury given the lack of a definitive impact injury.

Dr. Norat testified about the bruises on T.H. and explained that any bruise on a child who cannot yet crawl is concerning and is a cause for further evaluation. He documented bruises on T.H.'s chest, his back, his abdomen, and the back of his neck. Unlike Dr. Gebhard and Casas, he

testified that CPR is unlikely to leave bruising. The bruises were linear, which could be caused by being hit against an edge of an object or by squeezing. Dr. Norat explained that T.H. had petechial bruising on his neck which is highly associated with abuse; it is seen in about 23% of abuse cases and in only 2% of accident cases. On cross-examination he acknowledged that in his report, written the same day as the examination, he noted the injury only as an abrasion, and not a petechial bruise.

Dr. Norat testified that T.H.'s injuries were "highly concerning substantial evidence" of child abuse and fell into his highest level of assessment for abuse. Based on a 2011 medical study, Dr. Norat opined that there was a 98% likelihood that the injuries were the result of abuse instead of an accident. Stated differently, the injuries were 100,000 times more likely to be nonaccidental versus accidental. During cross-examination, the defense challenged the study's validity because some of the abuse cases were classified based on a conviction for abuse, rather than a determination reached by a scientific method. Dr. Norat also admitted that there is no way to quantify the amount of force used to cause T.H.'s injuries.

### (4)  The physical evidence

An extraction of data from Appellant's cell phone showed the texts and calls sent and received around the time T.H. was injured as well as the several websites he visited on the night of the event and next morning. Of significance to the State's case, the records show that Appellant dialed 911 at 8:37p.m., but hung up before the call connected and then deleted the call from his phone's call history. The State also focused on Appellant visiting an insurance company website, and YouTube during the evening of the injury and the next morning.

### (5) The 404(b) evidence—the death of Ethan

Some of the evidence heard by the jury was related to an extraneous offense. On March 4, 2012, Appellant was spending the night at his then-girlfriend Norma Rocha-Rodriguez's apartment. Appellant woke in the middle of the night to feed Norma's four-month-old, Ethan. He soon woke Norma, telling her to call EMS because Ethan was not breathing. Initially, Appellant told Norma and the police that Ethan choked as he was drinking a bottle. But, after questioning by detectives, Appellant said that he fell down the stairs with Ethan and landed on top of him. Ethan died from those injuries. Although detectives testified that Appellant gave different stories about what happened, he was not arrested or charged until after his arrest for injuring T.H, more than six years later. The trial court permitted the State to present evidence of that incident to show lack of accident in this case.[4] Tex. R. Evid. 404(b).

### (a) Carlos Segura

Carlos Segura was the paramedic who responded in 2012 to the 911 call regarding Ethan. Segura testified that he saw bruising around Ethan's head, stomach, and upper legs. He also recounted that he had been told that Ethan had stopped breathing; Appellant did not tell him that he fell down the stairs.

### (b) Dr. William McClain

Dr. McClain was the medical examiner who performed the 2012 autopsy on Ethan. He found that Ethan had suffered a blunt force trauma to the back of the head, causing subarachnoid

---

[4] The State based its argument for admission of the extraneous offense on the doctrine of chances. Under that doctrine, evidence of a "highly unlikely event being repeated" is admissible. *De La Paz v. State*, 279 S.W.3d 336, 348 (Tex. Crim. App. 2009). "Similarity is crucial to the doctrine of chances." *Valadez v. State*, 663 S.W.3d 133, 141 (Tex. Crim. App. 2022). Appellant does not challenge the admission of this evidence on appeal.

11

hemorrhages. He said that "with an infant, an impact to the head does not necessarily have to be extraordinarily forceful to create that [subdural and subarachnoid] bleeding." And cerebral edema (swelling of the brain) could be caused indirectly by a low-speed impact. But Ethan also had petechial hemorrhaging to the inner part of the brain, which requires a sudden acceleration or deceleration event. Dr. McClain also found evidence of old subdural bleeding, which has many potential causes, including birth trauma. Once someone has had one subdural hematoma, subsequent subdural hematomas require less force. He found bruises on Ethan's chest and abdomen and scratches on his legs. The scratches appeared to be older while the bruises all appeared to be from the recent incident. Dr. McClain acknowledged that some of the bruises, but not the scratches on the body could be caused from a fall down the stairs. And while he believed it is possible for Ethan's injuries to "have been the result of accidental trauma, the severity of the injuries, as well as the additional injuries inflicted upon the body, indicate that the injuries are most likely non-accidental." He concluded that the death was a homicide.

### (6) Appellant's case

#### (a) Terrance Harper

Appellant testified at trial. He stated that on the evening of July 11, 2018, he had been rushing to get everything ready to take T.H. to his mother's house because she planned to watch him while Appellant worked. He was feeding the dog, letting him out, and making a bottle, all while holding T.H. in such a way that there was no support on his back. Appellant testified that he dropped the scoop for the formula and when he bent down to pick it up, T.H. flung his head back. Appellant explained that he moved his arm quickly and tried to grab behind T.H. to prevent him from falling, but instead accidently hit the front of T.H., causing the infant to hit his head on the marble countertop. He said that he "immediately knew something was wrong." T.H.'s eyes rolled

12

back in his head and stopped breathing. Appellant thought that T.H. had died or was dying. He performed CPR but had never been trained in it. He was breathing in T.H.'s mouth and "tapping" him on the back. After a few minutes, T.H.'s eyes and breathing returned to normal. Appellant initiated, but did not follow through on a 911 call, and later deleted it. He admitted that he knew he was making a mistake, but panicked, re-lived the incident with Ethan, and was afraid no one would believe it was another accident. He believed that if he called for help, CPS would remove T.H. from him.

That night, he believed that T.H. had maybe suffered a concussion, but that he was going to be fine. He gave him a bottle and bath and then put him down to sleep. Appellant said that throughout the night, he would doze off, but would wake up and check on T.H. He testified that he put the Owlet sock on T.H. to monitor his vital signs which remained normal. He did not notice any signs of a seizure until the following morning when he saw that the right side of T.H.'s body seemed to be limp. He admitted that he lied to the doctors and initially to Taylor about how T.H. was injured. In his words, "I was just scared to lose my son and scared to lose my life and scared to go back through an investigation, and scared to be questioned and scared to not be believed." He believed that the bruises could have been caused by him doing CPR "too hard," because he was panicking. As for the healing fractures of T.H.'s ribs, Appellant maintained that he did not know the cause, that he never noticed any injuries on him, and T.H. had not shown any trouble breathing.

Appellant also testified about Ethan's death. He stated that he woke in the middle of the night because Ethan was crying. Norma did not wake up so Appellant got up to give Ethan a bottle. After feeding him, he carried Ethan with him back downstairs to put the bottle away. He tripped on the stairs and fell on top of Ethan. He told Norma to call 911 and he tried to give Ethan CPR,

13

but Ethan was turning purple. Appellant said that at first, he was scared to admit that he was at fault even though it was an accident. Like with T.H., Appellant admitted that he gave different stories to law enforcement and that he "handled it wrong" by adding things because he "felt like [he] had to fill in the blanks":

> When I was doing the demonstration [of falling on the stairs with Ethan], it was because I couldn't exactly give them what had happened. With everything happening so fast, you try to give them as much as you can. The more questions I got, the more I started to just try to add things, because I felt like they were just weren't [sic] getting it. Because I was trying to tell them I really can't explain everything, I really don't know everything, so I just started adding things to it.

But, the truth, he said, was that he did not slip on anything or drop Ethan's bottle; he was simply not paying attention and tripped.

In its cross-examination, the State relied on the testimony of the doctors to discredit Appellant's version of events. The State asked:

> Did you hear the doctors -- every physician that testified, the medical examiner that testified, that said that those injuries are not anywhere near consistent with a fall?
> . . .
> Did you hear the medical examiner testify in Ethan's case that the opening up of the brain revealed what's called petechiae in the parenchyma, which says with absolute certainty this is non-accidental trauma caused by severe force and inertia?
> . . .
> You heard the doctors testify that there's no way this was . . . an accidental injury?
> . . .
> Did you hear the testimony from Dr. Norat that described that babies don't get bruises . . . accidentally?

### (b) Dr. William Anderson

Appellant intended to call his own expert witness, Dr. William Anderson, to counter the State's medical evidence. Dr. Anderson was the former chief deputy medical examiner in Orange County, Florida and had reviewed T.H. and Ethan's medical records and autopsy reports.

14

Dr. Anderson could not appear in person because he was under subpoena to testify in a Florida court. As we explain below, the trial court denied Appellant's request for him to testify by Zoom. According to Appellant's bill of exception, Dr. Anderson would have testified that neither child had a diffuse axonic injury—the kind of high-speed acceleration/deceleration injury as described by the State's experts. Instead, both children could have been caused by low-speed accidents and that the children's injuries were consistent with an accident as Appellant described.

### (c) Appellant's other witnesses

Appellant called seven other witnesses. Two were related to the data extracted from the cell phone.[5] The other five witnesses included Appellant's parents, a neighbor, and friends. According to the testimony of Wayne and Elizabeth Harper—Appellant's parents—he told them that T.H. was injured by hitting his head on the counter and that he had fallen on the stairs with Ethan. Wayne testified that he never saw bruises before on T.H. and Elizabeth stated that she never witnessed Appellant losing his temper with T.H.

Maxine Walker knew Appellant since he was a child and worked at the school where he was a substitute teacher. She testified that she never saw Appellant lose his temper or raise his voice. Walter Higginbotham lived next door to Appellant's childhood home and also testified that he never saw Appellant lose his temper and that he did not believe that Appellant would intentionally hurt his child. Frances Benavides was a friend of both Appellant and Taylor. She visited them one time when T.H. was a few months old and did not see Appellant lose his temper with T.H.

---

[5] Appellant does not assert any error on appeal regarding the cell phone data.

## II. ISSUES ON APPEAL

Appellant raises seven issues on appeal. We summarize them briefly, but ultimately need address only two to resolve this appeal.

In Issue One, Appellant globally contends that the trial court deprived Appellant of the presumption of innocence through: (a) its instructions given the jury during voir dire; (b) by permitting the grand jury foreman to testify; and (c) by notifying the jury that they may be sequestered during deliberations.

Issues Two and Three are germane to the trial court's in camera review of CPS records and the State's failure to produce *Brady* materials from those records. Before trial, the State disclosed several hundred pages of CPS records to Appellant. On the second day of trial, the State notified Appellant of more records and Appellant requested that they be turned over. Rather than turn all the records directly over to Appellant, the court reviewed the nearly 8000 pages of records in camera and gave defense counsel 20 pages with redactions. Appellant urges that no privilege protects the records and the in camera review was unnecessary. Now armed with the records that are part of the sealed appellate record, Appellant contends they contain *Brady* material that could explain some of the injuries noted by the doctors.[6]

In Issue Four Appellant challenges the denial of his motion to suppress evidence extracted from Appellant's phone which had been seized without a warrant. A search warrant was later obtained for the contents of the phone. Appellant unsuccessfully moved to suppress the evidence extracted from the phone because of the initial warrantless seizure.

---

[6] For example, Taylor told CPS that T.H. had previously fallen off the bed and into a laundry basket, which could explain healing rib fractures. And Ethan's siblings told their therapist that Ethan had been thrown out of a window by his biological father (not Appellant).

16

Appellant's fifth issue complains that the trial court erred by refusing to instruct the jury on the lesser-included offense of reckless injury of a child. Because Appellant described the incident with T.H. as an "accident," the trial court reasoned that there was no evidence of the mental state needed for reckless injury to a child.

Appellant's sixth issue claims that the trial court abused its discretion in denying his motion for a continuance. Prior to trial, Appellant's lead counsel requested a continuance on the ground that he had just finished a capital murder trial which itself had been delayed and lasted four weeks. He claimed that he could not effectively represent Appellant because he had been unable to prepare through the previous month. The State objected to continuing the case because the case had been pending for three years and had been continued once before. Judge Jefferson Moore denied the continuance and noted that he wanted to finish the trial before the end of the year as he would be leaving the bench at that time.

In his seventh issue, Appellant contends that the trial court abused its discretion by not allowing Appellant's expert witness to testify by Zoom. We start and mostly end our discussion there.

## III. ANALYSIS

In his seventh issue, Appellant complains that he was denied the ability to have his expert medical witness testify. We start with some background.

### A. Appellant sought to call its medical expert by Zoom

After voir dire, but before testimony was offered, Appellant's and the State's attorneys held an on the record discussion about several matters. Judge Moore heard this portion of the trial. The judge first outlined the matters to be discussed and stated: "[W]e also want to put on the record

17

that we're now going to have some witnesses appear on Zoom, from I think both sides, video conferencing in."[7] When the discussion of Zoom came up, the judge asked "My understanding is both side[s] have Zoom witnesses; is that correct"? Appellant's counsel responded "Yes, Your Honor." And the State's attorney began discussing the timing of its Zoom witness. The trial judge then followed up:

> THE COURT: Okay. And my understanding is there's no objections from either side about proceeding with the video testimony?
>
> [STATE'S ATTORNEY]: Well, Judge, I don't know who they intend to offer and what the reasoning is. I mean, there's a very specific set of standards for that. Do y'all Zoom witnesses?
>
> [DEFENSE COUNSEL]: We may, yeah.

The judge then interjected, "Well, we'll take a break and figure that out." And at that time, Appellant agreed on the record to remote testimony of the State's CPS witness and expressly waived his Sixth Amendment right to confrontation. No further agreements about remote testimony appears in the record.

The State presented Brandi Flores, its CPS witness, by Zoom while Judge Moore presided over the trial. The State put on its last witness and rested on November 22nd. Appellant was to start his case on November 28th (following the Thanksgiving holidays), but after a juror took ill, Judge Moore recessed the proceedings, until a time when Judge Moore was not available to finish the trial. On November 30, Judge Raymond Angelini, presided and dismissed the ill juror, replacing the juror with the alternate. The defense then proceeded with its case.

---

[7] Zoom is a remote videoconferencing platform. While once largely unknown to the legal community, the COVID-19 pandemic has made its use ubiquitous for conducting legal proceedings. It is referenced in over 500 Texas appellate opinions as of the date of this opinion, and over 10,000 times in a search of all State and Federal Court opinions.

Appellant notified the court and the State that he would be calling Dr. William Anderson, his expert witness, by Zoom because Dr. Anderson was in Florida and under subpoena as a witness there.[8] Appellant told the court that he had only agreed to the remote testimony of the State's witness in exchange for the State's agreement that his witnesses could also testify by Zoom. The State denied that agreement. And because the State objected, and for no other reason apparent from the record, the trial court did not allow Appellant's witnesses to testify by Zoom.

Appellant later made a bill of exception that Dr. Anderson would have testified that he reviewed the medical records and autopsy reports for both T.H. and Ethan. Based on that review, Dr. Anderson did not believe that either child suffered a diffuse axonal injury (DAI) which is indicative of a high-speed injury and abuse. Further, he would have testified that the children's injuries were consistent with accidental injuries and the injuries could have been caused as Appellant described. Specifically, Ethan's injuries could have been caused by falling down the stairs and T.H.'s injuries could have been caused by a low-speed impact, like hitting his head on the countertop.

## B.   Preservation of error

Appellant frames his issue on appeal as a claim that the trial court abused its discretion in excluding the witness which rises to the level of denying him the ability to present a defensive theory. Appellant thus claims that the error implicates the Sixth and Fourteenth Amendments to the United States Constitution. The State argues that Appellant has entirely waived his seventh issue because he did not inform the trial court of the constitutional dimension of disallowing a Zoom presentation of Dr. Anderson. To preserve an issue for appeal, a party must make "a timely

---

[8] Appellant also planned to call Daniella Freitas, the mother of Appellant's daughter, to testify via Zoom. On appeal, Appellant did not challenge the trial court's denial of her remote testimony.

request, objection, or motion that . . . state[s] the grounds for the ruling that the complaining party sought." Tex. R. App. P. 33.1(a)(1). At trial, Appellant requested that he be allowed to call Dr. Anderson by Zoom and he provided the reasons for the trial court to exercise its discretion to grant that request—Dr. Anderson was in Florida under subpoena in a case there. On appeal, he argues that the trial court's refusal to allow remote testimony was an abuse of discretion. To the extent that Appellant argues that the error prevented him from presenting a defense in violation of the Sixth and Fourteenth Amendments, those issues are part of the harm analysis (discussed below) and not the ground of the error. Because Appellant made a request to the trial court and stated the grounds for the request, he preserved his complaint that the trial court abused its discretion. Tex. R. App. P. 33.1(a).[9]

## C. Abuse of discretion

We review a trial judge's decision to admit or exclude evidence under an abuse of discretion standard. *Henley v. State*, 493 S.W.3d 77, 82–83 (Tex. Crim. App. 2016). A trial judge

---

[9] The cases cited by the State for the proposition that this issue is entirely waived are inapt. Aside from cases stating general preservation requirements, the State relies on *Anderson v. State*, 301 S.W.3d 276, 279–80 (Tex. Crim. App. 2009). In that case, a defendant made an oral motion for continuance that under our procedural rules preserves nothing for review. The Court rejected the notion that there is a separate due process exception to that procedural failing. Here, there is no procedural failing in Appellant's effort to call a witness. The State also cites us to *Villasenor v. State*, No. 05-10-00969-CR, 2011 WL 3435376, at *1 (Tex. App.—Dallas Aug. 8, 2011, no pet.) (mem. op., not designated for publication). There, a defendant attempted to cobble together several complaints about restrictions on his ability to cross-examine a police officer into a single complaint that he was denied the right to present a complete defense. Even at that, the court addressed whether the trial court abused its discretion in the individual instances complained of. *Id.* at *2. We also note here that the trial court made its ruling on the Zoom exclusion without reference to what those witnesses would say—the court expressed no interest in considering the bill of exception:

> [Defense Counsel]: Okay. And then will the Court allow us to make a bill of exception as to those two witnesses via Zoom?
>
> THE COURT: I don't know. I've never heard of it. It doesn't matter to me. You can do whatever you want on your time. If they don't have to be here and I don't have to be here.
>
> [Defense Counsel]: I'm sorry?
>
> THE COURT: I don't have to be here and they don't have to be here. You can do whatever you want on a bill of exception. I mean, it has no meaning to me.

abuses its discretion when the decision falls outside the zone of reasonable disagreement. *Moses v. State*, 105 S.W.3d 622, 627 (Tex. Crim. App. 2003). Stated otherwise, the trial court abuses its discretion when it acts "without reference to any guiding rules and principles, or acts in a manner that is arbitrary or capricious." *Morris v. State*, 123 S.W.3d 425, 426 (Tex. App.—San Antonio 2003, pet. ref'd) (quoting *Lam v. State*, 25 S.W.3d 233, 236–37 (Tex. App.—San Antonio 2000, no pet.)). We begin with the guiding rules and principles that govern the admission of testimony by Zoom.

Disputes over the use of Zoom testimony more commonly arise when the State seeks to call a witness by Zoom and the defendant objects, asserting their Confrontation Clause rights to examine the witness face to face. *See, e.g.*, *Dies v. State*, 649 S.W.3d 273, 278 (Tex. App.—Dallas 2022, pet. ref'd) (rejecting defendant's 6th amendment objection to two witnesses who testified through Zoom). This case involves the converse. Appellant desired to call the witness by Zoom, and the State, lacking confrontation clause rights, must therefore assert some other ground for exclusion.

The guiding principles here start with Texas Rule of Evidence 611 that allows a trial court to control the presentation of evidence. Tex. R. Evid. 611 ("The court should exercise reasonable control over the mode and order of examining witnesses and presenting evidence so as to: (a) make those procedures effective for determining the truth; (b) avoid wasting time; and (c) protect witnesses from harassment or undue embarrassment.").[10] A trial court's discretion to control the presentation of evidence under Rule 611 must be exercised in a way "which is (1) reasonable and (2) in the pursuit of justice as well as efficiency." *Dang v. State*, 154 S.W.3d 616, 619 (Tex. Crim.

---

[10] For civil proceedings, recently promulgated rule of civil procedure 21d also gives courts discretion to allow a witness to appear by "videoconference, teleconference, or other available electronic means . . . ." Tex. R. Civ. P. 21d(b).

App. 2005). In applying Rule 611, the Waco Court of Appeals, after noting the advancements in technology, concluded that it saw "no reason at this time to create a per se rule precluding the trial court's admission of testimony in a trial through alternate means such as Skype or other technological platform that accommodates video as well as audio presentation of evidence." [11] *Interest of J.C.*, 582 S.W.3d 497, 504 (Tex. App.—Waco 2018, no pet.). Instead, the court reasoned that the decision should be left to the discretion of the trial court "based on the facts and circumstances presented and subject to appellate review for an abuse of that discretion." *Id.*; *see also Nikolenko v. Nikolenko*, No. 01-20-00284-CV, 2022 WL 479988, at *12 (Tex. App.—Houston [1st Dist.] Feb. 17, 2022) (mem. op.), *cert. denied*, 144 S.Ct. 1058 (2024) (agreeing that there is no per se rule allowing or disallowing testimony by Skype).[12]

Another important guidepost is the Texas Supreme Court's Emergency COVID-19 Order, in effect at the date of this trial, that expressly authorized the trial court to allow testimony by Zoom. That order provides:

> Subject to constitutional limitations and review for abuse of discretion, all courts in Texas may in any case, civil or criminal, without a participant's consent . . . allow or require anyone involved in any hearing, deposition, or other proceeding of any kind—including but not limited to a party, attorney, witness, court reporter, grand juror, or petit juror—to participate remotely, such as by teleconferencing, videoconferencing, or other means.

[11] Skype, like Zoom, is an application used for video calls and conferencing.

[12] And were there a per se rule that Zoom testimony must be excluded, absent waiver of the other party, the State could find that rule a hurdle when it needs to call witnesses remotely. *See Cervantes v. State*, 594 S.W.3d 667, 671 (Tex. App.—Waco 2019, no pet.) (State called a witness remotely who was caring for a breast-feeding newborn as well as four other children); *Acevedo v. State*, No. 05-08-00839-CR, 2009 WL 3353625, at *8 (Tex. App.—Dallas Oct. 20, 2009, pet. ref'd) (not designated for publication) (State called witness located in Chicago who was several months pregnant and under doctor's orders); *Stevens v. State*, 234 S.W.3d 748, 781 (Tex. App.—Fort Worth 2007, no pet.) (State called a 75-year-old nonvictim witness who suffered from heart problems and health status was "quite tenuous"); *United States v. Gigante*, 166 F.3d 75, 79 (2nd Cir. 1999) (Government called nonvictim witness was in final stages of inoperable, fatal cancer).

*Fifty-Fifth Emergency Order Regarding COVID-19 State of Disaster*, 660 S.W.3d 106, 107 (Tex. 2022).

Whether under Rule 611 or the Texas Supreme Court's Emergency Order, we review the trial court's refusal to allow Appellant's witness to testify remotely for abuse of discretion. *Interest of J.C.*, 582 S.W.3d at 504; *Fifty-Fifth Emergency Order*, 660 S.W.3d at 107. Here, the Appellant sought to call Dr. Anderson to testify via Zoom because Dr. Anderson was in Florida under subpoena for a different case. Appellant had not subpoenaed him, apparently believing that the State agreed that he could testify remotely. The trial court denied Appellant's request for Dr. Anderson to appear by Zoom based on nothing more than the State's opposition. The trial court told Appellant's counsel, "And if they object to you putting on witnesses by Zoom, I'm not going to allow it;" "I'm just telling you you can't do it by Zoom unless [the State] agree[s] to it. And they haven't agreed to it, so there you go."[13]

A trial court might consider a host of factors in deciding whether remote testimony is appropriate for a particular trial. *See Cervantes v. State*, 594 S.W.3d 667, 671 (Tex. App.—Waco 2019, no pet.) (discussing logistics of how the witness could be seen and heard by those in the courtroom); *Acevedo v. State*, No. 05-08-00839-CR, 2009 WL 3353625, at *6 (Tex. App.—Dallas Oct. 20, 2009, pet. ref'd) (not designated for publication) (discussing logistics of where witness would testify from and how jury and lawyers could interact in real time with witness testifying remotely). We acknowledge our standard of review requires that "if the trial court's evidentiary ruling is correct on any theory of law applicable to that ruling, it will not be disturbed even if the trial judge gave the wrong reason for his right ruling." *De La Paz v. State*, 279 S.W.3d 336, 344

---

[13] THE COURT: . . . My understanding is everything else is by Zoom, but I'm not going to allow Zoom testimony unless y'all [the State] agree to it. You're not agreeing to it, so there we go. It's easy.

23

(Tex. Crim. App. 2009). But the trial court here was not presented with *any* factor weighing against Dr. Anderson's testimony by Zoom. The State provided no reason for contesting Dr. Anderson's appearance by Zoom and, on appeal, explains only why it was permissible for *their* witness to testify by Zoom. When asked at oral argument why trial counsel objected to the remote testimony of Dr. Anderson, the State's attorney candidly answered that he did not know.

In summary, if there existed a per se rule preventing the use of Zoom testimony, then the State's refusal to waive that objection, even without stating a reason at all, might be valid. But there is no per se prohibition, and a refusal to allow the Zoom testimony must be based on something more than the "State objects." The trial court effectively delegated the exercise of its discretion to the State, making the State the keeper of the keys to expert testimony for the case. The denial of Dr. Anderson's testimony was neither reasonable nor in the pursuit of justice and efficiency.[14] We hold that on this record, it was an abuse of discretion to refuse Appellant's request to call Dr. Anderson to testify by Zoom.

### D. Harm analysis

Constitutional and non-constitutional error invoke different harm standards. Tex. R. APP. P. 44.2. If the error is constitutional, we "must reverse a judgment of conviction or punishment unless the court determines beyond a reasonable doubt that the error did not contribute to the conviction or punishment." *Id.* at 44.2(a). For non-constitutional error, we only reverse if the error affected a "substantial right" of an appellant. *Id*. at 44.2(b). "[I]t is the responsibility of the appellate court to assess harm after reviewing the record and . . . the burden to demonstrate

---

[14] It is "the primary duty of all prosecuting attorneys, including any special prosecutors, not to convict, but to see that justice is done." Tex. Code Crim. Proc. Ann. art. 2.01. Objecting to remote testimony without a valid reason, thereby preventing the jury from hearing a defendant's full defense, is contrary to the duty to seek justice.

whether the appellant was harmed by a trial court error does not rest on the appellant or the State." *Johnson v. State*, 43 S.W.3d 1, 5 (Tex. Crim. App. 2001). The parties "may assist by suggesting how the appellant was harmed (or not), but it is the responsibility of the reviewing court to decide whether it is likely that the error had some adverse effect on the proceedings." *Id.* at 4. With that task in mind, we first address which harm standard applies.

An error in excluding evidence rises to the level of constitutional error in two circumstances. The first is if a rule used to exclude the evidence itself "categorically and arbitrarily prohibits the defendant from offering otherwise relevant, reliable evidence vital to his defense[.]" *Walters v. State*, 247 S.W.3d 204, 219 (Tex. Crim. App. 2007). Appellant does not make that claim. The second category of constitutional error is when the rule itself does not implicate constitutional rights, but the court's erroneous application of the rule "results in the exclusion of admissible evidence that forms the vital core of a defendant's theory of defense and effectively prevents him from presenting that defense." *Walters*, 247 S.W.3d at 219.

Appellant urges this case falls under the Rule 44.2(a) analysis because the State's evidence that Appellant intentionally or knowingly injured T.H. and Ethan was based on expert testimony of doctors that the injuries were almost certainly non-accidental. Dr. Anderson's testimony was the only means Appellant had to directly contradict the State's evidence and the exclusion of his testimony denied him the ability to make a meaningful defense. If true, that makes this case like *Cuadros-Fernandez v. State*, where the Dallas Court of Appeals held that the exclusion of expert witness testimony was constitutional error. 316 S.W.3d 645, 664–65 (Tex. App.—Dallas 2009, no pet.). There, the State alleged that the defendant caused a child's death by hitting his head against a cabinet door. *Id.* at 661. A physician and the medical examiner testified that the child's injuries were consistent with his head being struck against a cabinet door. *Id.* at 654. The State

25

presented evidence of damage to the cabinet door and a recent repair. *Id*., at 664. A defense expert would have testified that the damage to the door could not have been caused as the State claimed, but by ordinary wear and tear. *Id.* The trial court excluded the defense expert. The Dallas court applied the Rule 44.2(a) harm standard because the trial court's exclusion foreclosed the defendant's only expert who could "directly counter the State's position[.]" *Id.* "Thus, [the witness's] expert testimony formed such a vital part of appellant's case that the trial court's exclusion of that evidence effectively prevented appellant from presenting a defense." *Id.* at 664–65; *See also Stephenson v. State*, 226 S.W.3d 622, 628 (Tex. App.—Amarillo 2007, no pet.) (when the only evidence that defendant was the perpetrator of a crime is eyewitness identification, it was constitutional error to exclude expert testimony about the reliability of eyewitness testimony because the testimony was vital to the defense).

At oral argument, the State agreed that if any error standard applies, we must look to the Rule 44.2(b) standard.[15] The argument for the Rule 44.2(b) standard must be that Appellant was not entirely denied the ability to present his defense. He testified to his version of events on the stand, and through video statements recorded after T.H.'s injuries and Ethan's death. *See Ray v. State*, 178 S.W.3d 833, 836 (Tex. Crim. App. 2005) (applying 44.2(b) standard for the exclusion of a fact witness when the defendant testified at trial to the same defensive theory the excluded witness would have supported). Appellant's counsel was able to gain some qualified admissions from the State's experts that some of the children's injuries could have been caused by low-speed injuries. We say qualified because the verbiage used by the expert's belied the proposition

---

[15] The State's brief does not argue for any error standard or address harmless error. It makes only two responses to Issue Seven: that the issue is waived as we address above, and the trial court did not abuse its discretion in allowing the State to call *its* witness by Zoom.

Appellant sought to prove. For instance, Dr. McClain, when asked if Ethan's injuries could be caused by a fall down the staircase, testified that "I don't believe that that's the case, but that it's impossible to rule out that scenario or any other of a million scenarios." He later added that Ethan's bruises in the pubic region and petechial hemorrhaging show it was not a slow speed fall down the stairs. Dr. Gebhard, when asked if T.H.'s injuries could be caused by hitting his head on the counter, responded that "yeah, it might explain some of the injuries" but he then added it was probably not consistent with the degree of injuries and the broken ribs. He agreed that the retinal injuries could come from the child's head hitting the countertop, but it would have to "be a pretty aggressive hit to the head." Appellant's cross examination of the State's expert left him only qualified admissions to argue in closing.

Ultimately, we need not decide how to categorize the trial court's error because we hold that it would be harmful even under the non-constitutional substantial harm test. Tex. R. App. Proc. 44.2(b). Non-constitutional error does not affect a substantial right and is harmless if the court is "fairly assured that the error did not influence the jury or had but a slight effect[.]" *Ray*, 178 S.W.3d at 836. We make this determination by reviewing the entire record and considering "(1) the character of the alleged error and how it might be considered in connection with other evidence; (2) the nature of the evidence supporting the verdict; (3) the existence and degree of additional evidence indicating guilt; and (4) whether the State emphasized the complained of error." *Gonzalez v. State*, 544 S.W.3d 363, 373 (Tex. Crim. App. 2018). We take those factors in turn, combining the second and third.

### (1)   Character of the evidence and its connection to other evidence

The excluded expert's testimony addressed a central theme of the State's case: expert testimony attributed both T.H. and Ethan's injuries to a high-speed inertial or rotational movement

that caused shearing injuries in the brain. Drs. Gebhard, Norat, and McClain all testified that they concluded the respective children's injuries were non-accidental based in part on the likely inertial injuries to the brain (followed by swelling and cell death). That is, both children had subdural hematomas most likely resulting from rapid high-speed rotational movements, such as shaking the child or hitting the child's head violently against a surface, or with some object. The description is sometimes referred to as diffuse axonal injury. *See Briones v. State*, No. 04-23-00090-CR, 2024 WL 2165375, at *4 n.5 (Tex. App.—San Antonio May 15, 2024, no pet. h.) (noting that in another child abuse case, Dr. Gehhard described a diffuse axonal injury as when nerves in the brain are sheared off with rotational injuries); *Durham v. State*, No. 10-04-00248-CR, 2005 WL 2787550, at *7 (Tex. App.—Waco Oct. 26, 2005, pet. ref'd) (mem. op., not designated for publication) ("'Diffuse axonal injury' is trauma where the gray matter and white matter planes in the brain are caused by external forces to slide 'out of kilter.'"); *In re J.A.B.*, 440 S.W.3d 818, 820 (Tex. App.— El Paso 2013, no pet.) (describing a diffuse axonal injury as a shearing of the brain cells). Both Drs. Gebhard and Norat in this case similarly described a shearing injury to T.H.'s brain.

The offer for Dr. Anderson suggests he would have refuted that claim by testifying that neither child had a diffuse axonic injury. Appellant's counsel intended to use that opinion to attack the claim that either child suffered a high-speed injury, which was one rationale for the State's experts to conclude that the children suffered abuse, rather than an accident.

The State's experts also based their opinion on the constellation of other injuries (bruising, healing rib fractures) that they found. But the offer of proof for Dr. Anderson stated that he would have testified that Ethan's injuries were consistent with a fall down the stairs and T.H.'s injuries were consistent with hitting his head on the counter as claimed by Appellant. If the jury found

Appellant and Dr. Anderson credible, they could have believed Appellant's explanations for these injuries as well (for example, that the bruises were caused by improper CPR).

The exclusion of expert testimony on a critical trial issue implicates the substantial rights of a defendant. One of our sister courts reached that conclusion in a felony DWI case when the trial court erroneously excluded an expert who would have testified that the defendant could not have been driving while intoxicated because of the timelapse since his last drink. *Morales v. State*, No. 01-99-00457-CR, 2001 WL 522020, at *3 (Tex. App.—Houston [1st Dist.] May 17, 2001, no pet.) ("This excluded testimony would have substantially bolstered appellant's defense. While we do not necessarily believe the jury would have acquitted appellant but for the trial court's error in excluding the testimony, we cannot state with fair assurance that the excluded testimony would have had no effect, or but slight effect, on the jury's consideration of appellant's defense."). Another of our sister courts similarly found Rule 44.2(b) harm when a trial court excluded an expert who could have explained how the defendant's mental abnormality negated the mens rea element in an aggravated assault case. *Ruffin v. State*, No. 10-06-00215-CR, 2009 WL 3048572, at *4 (Tex. App.—Waco Sept. 23, 2009, no pet.) ("The jury did not have the opportunity to hear Carter's testimony, which was relevant to his failure-of-proof defense, and to evaluate its credibility in addition to other evidence presented at trial."). This Court reached a similar conclusion in a case where the State was allowed to improperly impeach the defendant's sole expert on a central issue in a murder trial. *Hernandez v. State*, No. 08-19-00152-CR, 2022 WL 1767570, at *11 (Tex. App.—El Paso May 31, 2022, pet. ref'd) ("[The expert's] testimony was at the heart of the defense case" as it impeached the State's eyewitness and showed the defendant was not the shooter).

In a case involving the exclusion of a key fact witness, the Court of Criminal Appeals concluded that error in excluding relevant evidence required reversal under the non-constitutional, substantial harm error standard. *Ray*, 178 S.W.3d 835. In that case, the appellant was charged with possession of a controlled substance with intent to deliver. *Id*. The trial court excluded the testimony of appellant's acquaintance that the driver, not the appellant, had given him drugs that day. *Id*. at 834. The Court of Criminal Appeals held that the error was not harmless because the excluded evidence pertained to "the only contested issue," whether appellant possessed the drugs, and excluding it meant that appellant "was precluded from presenting third-party witness testimony which would have corroborated and given independent credibility to the defense she sought to establish." *Id.* at 836.

**(2) Nature of testimony supporting the verdict; and (3) additional evidence supporting the verdict**

There were no eyewitnesses to either child's injury (other than Appellant). Thus the State's case was built on several other foundations: (1) expert witness testimony, (2) Appellant's initial false accounts for what happened, (3) the similarity of T.H. and Ethan's cases (the law of chances), and (4) inferences that could be drawn from Appellant's demeanor and actions following T.H.'s injury. While the State's case was not built exclusively on the expert testimony, that testimony allowed the jury one clear avenue to discount Appellant's credibility and version of events necessary to refute the State's other arguments. The State used their medical witnesses to show how Appellant's version of events—the one he advanced at trial—was inconsistent with the injuries that T.H. and Ethan suffered. And if the jury accepted that premise, they would be well justified in disbelieving everything else Appellant testified to at trial.

No doubt, Appellant offered false narratives in the first hours after each child was injured, which he later recanted, followed by what he claims is the true version of events. For Ethan's death, he first claimed the child choked on a feeding bottle but soon told the investigators about the fall down the stairs. As T.H. was being assessed by Dr. Ross and then at the hospital, he offered several explanations for the injuries (a bowel movement, hitting his head in the bath on the child carrier, the dog). The next day, he confided with Taylor and gave a statement to CPS that was consistent to what he testified to a trial. A jury might either accept or discount his explanation for not being immediately truthful, but without some sufficient rebuttal to Drs. Gebhard, Norat, and McClain, he would have little chance of maintaining any credibility. That is, both his original explanation and his later explanation would be seen as lies.

The State's case also rested on the improbability that Appellant could have been involved in two accident events to children of the same approximate age and who suffered similar injuries. The foundational logic for that argument is the instinctive process of reasoning that an unusual and abnormal event might occur once, but the more often it happens, the less likely that chance is the likely explanation. *See Plante v. State*, 692 S.W.2d 487, 491–92 (Tex. Crim. App. 1985) (en banc). Because Dr. Anderson would have addressed both incidents, his testimony would have challenged the State's reliance on a law of chance argument.

### (3) Whether the State emphasized the contested evidence

Our record shows that the State emphasized its experts' testimony to the jury. The State called five medical witnesses at trial including three who offered expert opinion that challenged Appellant's version of events. The State cross-examined Appellant with paraphrased statements

31

from three of the doctors. The doctors' testimony figured prominently in the State's closing.[16] The State's counsel in closing reiterated several parts of Dr. McClain's testimony: his claim that Dr. McClain testified that "there was no question that [Ethan's death] was a non-accidental event"; that Ethan's bruising could not have happened on the stairs; that dissection of Ethan's brain showed a rapid deceleration and acceleration injury. The State's counsel focused on Drs. Gebhard and Norat's testimony that T.H.'s injury was from "inertial forces, rapid acceleration and deceleration." Counsel emphasized Drs. Gebhard and Norat's testimony about the presence of retinal hemorrages. And counsel reminded the jury that both doctors did an in-court demonstration with a doll to show how hard a child would need to be struck to cause those injuries.[17] *Cf. Hernandez*, 2022 WL 1767570, at *11 (State highlighted its claim that the defense expert was guilty of "perjury" in its closing statement).

* * * * * *

We conclude that the trial court's error affected Appellant's substantial rights. Tex. R. App. P. 44.2(b). Dr. Anderson's testimony was relevant to the only contested issue—whether Appellant intended to cause serious injury. *See Ray*, 178 S.W.3d 835 (excluded witness would have testified to "critical element" in possession and delivery of drugs case); *Morales*, 2001 WL 522020, at *3 (excluded expert would have challenged essential element of the State's case that the defendant was intoxicated); *Ruffin*, 2009 WL 3048572, at *4 (excluded expert would have challenged essential mens rea element of State's case); *Hernandez*, 2022 WL 1767570, at *11 (negating defendant's sole expert struck "at the heart of the defense case"). And, as in *Ray*, without

---

[16] The State's attorney referenced Dr. McClain five times in closing, Dr. Gebhard ten times, and Dr. Norat five times.

[17] The State's Counsel stated in closing: "You heard the first impact when Dr. Gebhard struck that baby against there. These are serious hard knowing intentional movements that Terrance Harper did to these babies. It is not some accident that occurred."

Dr. Anderson's testimony, Appellant lacked a third-party witness or other evidence to corroborate his testimony that T.H. and Ethan's injuries were accidental. He was Appellant's only medical expert and the only expert who could verify that it is medically possible for both childrens' injuries to be caused by the accidents as Appellant described. *See Ruffin*, 2009 WL 3048572, at *4 (discussing need for an expert to explain significance of lay testimony recounting defendant's odd statements). Even if a jury found Appellant credible, it would be difficult to acquit him in the face of the State's three expert witnesses who testified, without rebuttal, that based on the nature of T.H. and Ethan's injuries, they had been abused. We cannot be fairly assured that the exclusion of Dr. Anderson's testimony "did not influence the jury or had but a slight effect." *Ray*, 178 S.W.3d at 836. We sustain Appellant's seventh issue.

## IV. REMAINING ISSUES

All but one of Appellant's remaining issues pertain to rulings and events that transpired at trial, but which are mooted by a retrial of the case. That is, the CPS records that Appellant complains of not receiving before the first trial have now all been provided. His counsel complains of being forced to trial after just finishing a four-week capital murder, but that might not be the case for a retrial. We therefore decline to reach those issues. *See* Tex. R. App. P. 47.1 (we "must hand down a written opinion that is as brief as practicable but that addresses every issue raised and necessary to final disposition of the appeal").

Appellant's fourth issue, however, complains of the trial court's ruling on a motion to suppress that would survive to the next trial. While T.H. was in the hospital, Appellant and Taylor went to the police station for questioning. While there, Appellant was asked to empty his pockets and he complied. When he was leaving the police station, his personal belongings, except for his

phone, were returned. Later, the police obtained a warrant and searched the phone. Through this search, the police obtained the communications between Taylor and Appellant and evidence of apps and websites used and visited around the time of T.H.'s injury and the next day. Examination of the phone also showed that Appellant dialed 911 after T.H. was hurt, but hung up before the call connected, and deleted the call.

Appellant moved to suppress that evidence because it was obtained from the warrantless seizure of his phone. The trial court denied the motion but did not make any written findings. Appellant's fourth issue argues that the phone's warrantless seizure was illegal under the Fourth Amendment and Article 38.23 of the Code of Criminal Procedure, and so all evidence from the phone must be excluded.

Appellate courts review a trial court's ruling on a motion to suppress under a bifurcated standard. *See State v. Arellano*, 600 S.W.3d 53, 57 (Tex. Crim. App. 2020). Under that standard, we must give "almost total deference to a trial court's determination of the historical facts that the record supports especially when the trial court's fact findings are based on an evaluation of credibility and demeanor." *Guzman v. State*, 955 S.W.2d 85, 89 (Tex. Crim. App. 1997) (en banc). This same level of deference is accorded to a trial court's ruling on "application of law to fact questions," or "mixed questions of law and fact," if the resolution of those questions turns on an evaluation of credibility and demeanor. *Amador v. State*, 221 S.W.3d 666, 673 (Tex. Crim. App. 2007) (quoting *Montanez v. State*, 195 S.W.3d 101, 107 (Tex. Crim. App. 2006)). But we review de novo the trial court's determination of legal questions and the application of the law to facts that do not turn upon a determination of witness credibility and demeanor. *Arellano*, 600 S.W.3d at 57–58.

Where, as here, the trial court makes no explicit fact findings and neither party has timely requested findings and conclusions from the trial court, we "impl[y] the necessary fact findings that would support the trial court's ruling if the evidence (viewed in the light most favorable to the trial court's ruling) supports these implied fact findings." *State v. Kelly*, 204 S.W.3d 808, 819 (Tex. Crim. App. 2006). And "[w]e view the record in the light most favorable to the trial court's ruling and uphold the ruling if it is supported by the record and is correct under any theory of the law applicable to the case." *State v. Ruiz*, 577 S.W.3d 543, 545 (Tex. Crim. App. 2019). We will reverse the trial court's suppression decision only if it is outside the zone of reasonable disagreement. *State v. Dixon*, 206 S.W.3d 587, 590 (Tex. Crim. App. 2006).

On appeal, Appellant and the State focus their arguments on whether there was probable cause and exigent circumstances justifying the seizure of the phone. However, we ground our analysis and holding on a different principle—the independent source doctrine.[18]

More than a hundred years ago, the United States Supreme Court recognized that while evidence illegally obtained cannot be used, "[i]f knowledge of [facts] is gained from an independent source they may be proved like any others." *Silverthorne Lumber Co. v. United States*, 251 U.S. 385, 392 (1920). The Supreme Court's decision in *Segura v. United States*, 468 U.S. 796 (1984), illustrates how a warrant can operate as an independent source of evidence. In that case, the police suspected defendants of possessing and distributing cocaine. *Id*. at 800. They entered the defendants' apartment without a warrant but did not conduct a search until after a warrant was issued. *Id*. at 800–01. The defendant argued that the police's initial illegal entry tainted all the

---

[18] The trial court raised this very issue: "I should say my theory is that if they got a warrant to search the phone, I think that cures the issue of seizing the phone without a warrant. Because, I mean, at that point whoever the search warrant judge is concerned, I believe we'd have probable cause to show why it was seized in the first place."

evidence that was later found in the apartment. *Id.* at 805–06. The Court held that the source of the evidence was the search warrant which was independent of the illegal entry. Because none of the information used to obtain the search warrant came from the warrantless entry, the "legality of the initial entry [was], thus, wholly irrelevant[.]" *Id*. at 814. "The valid warrant search was a 'means sufficiently distinguishable' to purge the evidence of any 'taint' arising from the entry." *Id*. at 814 (quoting *Wong Sun v. U.S.*, 371 U.S. 471, 488 (1963)).

Although the independent source doctrine originally applied to Fourth Amendment issues, the Texas Court of Criminal Appeals has held that it also applies to State suppression rules. *Wehrenberg v. State*, 416 S.W.3d 458, 468 (Tex. Crim. App. 2013) (holding that evidence from a source independent of any illegal police act is not "obtained" in violation of the law and is not subject to exclusion under Article 38.23); *see also Gonzalez v. State*, 608 S.W.3d 98, 106 (Tex. App.—San Antonio 2020, pet. ref'd) (stating that a valid warrant "effectively attenuated any possible taint from the investigation" because the warrant application relied on information from defendant's wife and not from the police's pre-warrant viewing of videos on the defendant's iPad); *Harris v. State*, No. 04-20-00116-CR, 2022 WL 1230087, at *5 (Tex. App.—San Antonio Apr. 27, 2022, no pet.) (mem. op., not designated for publication) (holding that DNA evidence obtained with a warrant was admissible despite a previous illegal seizure because the warrant affidavit did not rely on information from that seizure) (mem. op., not designated for publication); *King v. State*, No. 03-17-00276-CR, 2018 WL 5728765, at *11 (Tex. App.—Austin Nov. 2, 2018, pet. ref'd) (affirming the denial of a motion to suppress cell phone evidence because the warrant was based on information independent of an earlier warrantless search of the phone).

In this case, the warrant affidavit alleged the facts taken from the hospital staff, Taylor, and CPS. None of the information was obtained from the phone itself after it was seized. Like in

*Segura*, the warrant was an independent source of the evidence extracted from the phone and the seizure of the phone was irrelevant.[19] The trial court's denial of Appellant's motion to suppress is therefore supported by the evidence regardless of whether there was probable cause and exigent circumstances to seize Appellant's phone. *Segura*, 468 U.S. at 815, ("Suppression is not justified unless 'the challenged evidence is in some sense the product of illegal governmental activity.'") (quoting *United States v. Crews*, 445 U.S. 463, 471 (1980)). We overrule Issue Four.

## CONCLUSION

The trial court abused its discretion by denying Appellant's request to call his expert witness to testify by Zoom. We sustain Appellant's seventh issue and reverse and remand for a new trial. We overrule Appellant's fourth issue and need not reach his remaining issues.

JEFF ALLEY, Chief Justice

July 29, 2024

Before Alley, C.J., Palafox and Soto, JJ.

(Do Not Publish)

---

[19] The independent source doctrine cannot be avoided by arguing that, had the police not seized the evidence, the defendant could have destroyed it before it could be discovered pursuant to a warrant. *Segura*, 468 U.S. at 816.